## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT (HARTFORD)

IN RE:

GORDON ALEXANDER CLARK

BK No.:  23-20642-JJT
Chapter 13

SANTANDER BANK, N.A., MOVANT

vs.

GORDON ALEXANDER CLARK

DEBTOR(S)

ROBERTA NAPOLITANO, Esq.
TRUSTEE

RESPONDENTS

## MOTION FOR RELIEF FROM AUTOMATIC STAY

Santander Bank, N.A. together with its successors and assigns ("Movant"), your moving party in the within Motion, respectfully represents as follows:

1.  Movant is an entity with a mailing address of 601 Penn Street, Reading, Pennsylvania 19601.

2.  The Debtor, GORDON ALEXANDER CLARK is an individual who resides at 70 ELM STREET, ENFIELD, CT 06082.

3.  Lillian J. Clark is the obligor pursuant to promissory note (the "Note") dated March 21, 2008, in the original principal amount of $100,000.00, a copy of which is annexed as Exhibit "A".

23-16838 BKMFR01

4.   To secure the Note, Lillian J. Clark executed in favor of, and delivered a mortgage to Sovereign Bank (the "Mortgage", together with the Note and any other loan documents executed in connection therewith, the "Loan Documents") dated March 21, 2008, securing the Note and encumbering the property located at  70 Elm Street, Enfield, CT 06082 (the "Property").  A copy of the Mortgage is annexed as Exhibit "B" and incorporated herein by reference.

5.   There is no other collateral to secure the Note.

6.   Movant is the current holder of the Loan Documents by virtue of merger documents, a copy of which is annexed as Exhibit "C".

7.   A foreclosure action was commenced in the Connecticut Superior Court by Santander on November 22, 2019, bearing docket number HHD-CV19-6120472-S. A judgment of foreclosure by sale entered on May 19, 2023.

8.   Upon information and belief, Lillian J. Clark is deceased and the Debtor is the executor and sole beneficiary of her estate.

9.   On August 15, 2023, the Debtor, Gordon Alexander Clark, filed a petition under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut.

10. As of September 13, 2023, the total amount due and owing pursuant to the Loan Documents was $173,697.22 in principal, accrued interest, late charges, miscellaneous fees, and attorneys' fee and costs, plus any additional interest, attorneys' fees, costs or expenses.

11. There is an estimated pre-petition arrearage in the amount of $108,854.56 due and owing under the Loan Documents.

12. As of September 13, 2023, there is a post-petition payment arrearage owing pursuant to the Loan Documents in the amount of $868.86, consisting of payment due from September 1, 2023. This amount is exclusive of attorneys' fees, costs, and expenses in connection with this Motion.

13. The regular monthly payment due under the Loan Documents at this time is approximately $868.86.

14. The total amount of encumbrances on the Property is approximately $494,555.20.

15. The Debtor's Schedules list a fair market value for the Property of $240,000.00.

16. Movant seeks relief from the automatic stay pursuant to 11 U.S.C. §362(d)(1) for cause on the basis that the Debtor is in default of their payment obligations resulting in an arrearage owing under the Loan Documents.

17. Further, the to extent there a exists a co-debtor stay pursuant to 11 U.S.C. §1301(a) as to Lillian J. Clark, Movant seeks that said co-debtor stay be modified on the basis that (a) upon information and belief, the co-debtor received consideration for the claim held by the Creditor as the co-debtor was an owner of the Property; (b) the plan filed by the Debtor proposes not to pay the claim held by the Creditor; and (c) the Creditor's interest would be irreparably harmed by continuation of such stay.

WHEREFORE, Movant requests that the Court:

(1) grant relief from the section 362 automatic stay, the section 1301(a) co-debtor stay and the stay imposed by Bankruptcy Rule of Procedure 4001(a)(3) for the purpose of exercising its various non-bankruptcy rights and remedies including, without limitation:

a. taking possession of the Property, obtaining a deed-in-lieu of foreclosure and/or

foreclosing the Mortgage

     b.  taking such action as may be necessary to evict the Debtor or any occupant from the Property.

     (2)  that the Trustee cease making any further distributions to the Movant; and

     (3)  order such other and further relief as may be just and proper.

Santander Bank, N.A.

By Its Attorney,

*/s/Sara M. Buchanan*
Lawson Williams, III, CT Bar No. 30907
Jeffrey J. Hardiman, CT Bar No. 24355
Sara M. Buchanan, CT Bar No. 30340
Attorney for Creditor
BROCK & SCOTT, PLLC
3825 Forrestgate Drive
Winston Salem, NC 27103
Telephone: (844) 856-6646
Facsimile: (704) 369-0760
NEWENGLANDBKR@brockandscott.com

23-16838 BKMFR01

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE:<br><br>GORDON ALEXANDER CLARK | BK No.:  23-20642-JJT<br>Chapter 13 |
| SANTANDER BANK, N.A., MOVANT<br><br>vs.<br><br>GORDON ALEXANDER CLARK<br><br>DEBTOR(S)<br><br>ROBERTA NAPOLITANO, Esq.<br>TRUSTEE<br><br><br>RESPONDENTS | DOC. I.D. NO. ____ |

PROPOSED ORDER GRANTING
MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Following notice and a hearing, see Bankruptcy Code Section 102(1)(A), on

Santander Bank, N.A. (hereafter, the "Movant")  Motion for Relief from Stay (hereafter,

the "Motion"), Doc. I. D. No. _____,

**IT IS HEREBY ORDERED** that the Motion is **GRANTED** – the automatic stay

of 11 U.S.C. § 362(a) is hereby modified pursuant to 11 U.S.C. § 362(d) to permit the

Movant, and/or its successors and assigns, to commence, continue and prosecute to

judgment a foreclosure action and otherwise exercise its rights, if any, with respect to real

property known as  70 Elm Street, Enfield, Connecticut 06082 in accordance with

applicable state law, and

**IT IS FURTHER ORDERED** that the Trustee is directed to cease making any

further distributions to the Movant, and

**IT IS FURTHER ORDERED** that ten-day stay afforded by Fed. R. Bankr. P. 4001(a)(3) is not applicable and the Movant may immediately enforce and implement this Order.

_____

United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT (HARTFORD)**

IN RE:

GORDON ALEXANDER CLARK

BK No.:  23-20642-JJT
Chapter 13

SANTANDER BANK, N.A., MOVANT

vs.

GORDON ALEXANDER CLARK

DEBTOR(S)

ROBERTA NAPOLITANO, Esq.
TRUSTEE

RESPONDENTS

<u>**CERTIFICATE OF SERVICE**</u>

   I, the undersigned, hereby certify that a true and exact copy of the foregoing Motion for Relief from Automatic Stay, Proposed Order, Notice of Contested Matter Response Date, Supplemental Declaration in Support of Motion for Relief from Automatic Stay, Affidavit Regarding Standing, and Relief from Stay Worksheet - Real Estate has been electronically served or mailed, postage prepaid on this day to the following:

GORDON ALEXANDER CLARK
70 ELM STREET
ENFIELD, CT 06082

Roberta Napolitano, Bankruptcy Trustee
10 Columbus Boulevard
Ste 6th Floor
Hartford, CT 06106
notices@ch13rn.com

23-16838 BKMFR01

Office of the U.S. Trustee, US Trustee
Giaimo Federal Building
150 Court Street, Room 302
New Haven, CT 06510
USTPRegion02.NH.ECF@USDOJ.GOV

October 17, 2023

/s/Sara M. Buchanan
Lawson Williams, III, CT Bar No. 30907
Jeffrey J. Hardiman, CT Bar No. 24355
Sara M. Buchanan, CT Bar No. 30340
Attorney for Creditor
BROCK & SCOTT, PLLC
3825 Forrestgate Drive
Winston Salem, NC 27103
Telephone: (844) 856-6646
Facsimile: (704) 369-0760
NEWENGLANDBKR@brockandscott.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT (HARTFORD)**

| | |
|---|---|
| IN RE: <br><br> GORDON ALEXANDER CLARK | BK No.:  23-20642-JJT <br> Chapter 13 |

SANTANDER BANK, N.A., MOVANT

vs.

GORDON ALEXANDER CLARK

DEBTOR(S)

ROBERTA NAPOLITANO, Esq.
TRUSTEE


RESPONDENTS

---

<u>NOTICE OF CONTESTED MATTER RESPONSE DATE</u>

Santander Bank, N.A. (the "Movant") has filed a Motion for Relief from Automatic Stay,

(the "Contested Matter") with the U.S. Bankruptcy Court.  Notice is hereby given that

any response to the Contested Matter must be filed with the Court no later than <u>October</u>

<u>31, 2023</u> in accordance with Federal Rules of Bankruptcy Procedure 2002(a) and 9014.*

In the absence of a timely filed response, the proposed order in the Contested Matter

***may*** enter without further notice and hearing, *see,* 11 U.S.C. § 102(1).

*Pursuant to Federal Rule of Bankruptcy Procedure 9006(f), if service is made by mail, three days are added after the response date set in this notice.


Dated: October 17, 2023                    Santander Bank, N.A.
                                           By Its Attorney,

                                           */s/Sara M. Buchanan*
                                           Lawson Williams, III, CT Bar No. 30907
                                           Jeffrey J. Hardiman, CT Bar No. 24355
                                           Sara M. Buchanan, CT Bar No. 30340
                                           Attorney for Creditor
                                           BROCK & SCOTT, PLLC
                                           3825 Forrestgate Drive
                                           Winston Salem, NC 27103
                                           Telephone: (844) 856-6646
                                           Facsimile: (704) 369-0760
                                           NEWENGLANDBKR@brockandscott.com

23-16838 BKMFR01

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT (HARTFORD)**

| | |
|---|---|
| IN RE:<br><br>GORDON ALEXANDER CLARK | BK No.:  23-20642-JJT<br>Chapter 13 |

| |
|---|
| SANTANDER BANK, N.A., MOVANT<br><br>vs.<br><br>GORDON ALEXANDER CLARK<br><br>DEBTOR(S)<br><br><br>ROBERTA NAPOLITANO, Esq.<br>TRUSTEE<br><br><br>RESPONDENTS |

SUPPLEMENTAL DECLARATION IN SUPPORT OF
MOTION FOR RELIEF FROM AUTOMATIC STAY

I, _Melissa A Epler_____, declare under penalty of perjury as follows:

1.    I am a/an _Bankruptcy Specialist_ of Santander Bank, N.A.,

and am authorized to sign this supplemental declaration on behalf of Santander Bank,

N.A. (hereinafter "Movant"). This supplemental declaration is provided in support of the

Motion for Relief from Stay (the "Motion") filed contemporaneously herewith.

2.    As part of my job responsibilities for Santander Bank, N.A., I have personal

knowledge of and am familiar with the types of records maintained by Santander Bank,

N.A. in connection with the loan that is the subject of the Motion (the "Loan") and the

procedures for creating those types of records.  I have access to and have reviewed the

23-16838 BKMFR01

books, records and files of Santander Bank, N.A. that pertain to the Loan and extensions of credit given to Debtor concerning the property securing such Loan.

3.      The information in this declaration is taken from Santander Bank, N.A.'s business records regarding the Loan. The records are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge; (b) kept in the course of Santander Bank, N.A.'s regularly conducted business activities; and (c) it is the regular practice of Santander Bank, N.A. to make such records.

4.      The Debtor, GORDON ALEXANDER CLARK, has executed and/or delivered and/or is otherwise obligated with respect to that certain promissory note referenced in the Motion (the "Note"). Pursuant to that certain mortgage referenced in the Motion (the "Mortgage"), all obligations of the Debtor under and with respect to the Note and the Mortgage are secured by the property referenced in the Motion.

5.      As of September 13, 2023, there are one or more defaults in paying post-petition amounts due with respect to the Note.

6.      As of September 13, 2023, the unpaid principal balance of the Note is $80,897.23.

7.      The Debtor's Schedule A/B lists the fair market value of the Property as $240,000.00.

8.      The following chart sets forth those post-petition payments, due pursuant to the terms of the Note that have been missed by the Debtor as of September 13, 2023:

| Number of Missed Payments | From | To | Monthly Payment Amount | Total Amounts Delinquent |
|---|---|---|---|---|
| 1 | 09/01/2023 | 09/01/2023 | $868.86 | $868.86 |
| Less Suspense Balance: | | | | ($0.00) |

Total: **$868.86**

9.      As of September 13, 2023, the total post-petition arrearage/delinquency is $868.86. This is the amount necessary to cure any post-petition default on or about the date hereof.

10.     The next payment under the terms of the Note will come due on October 1, 2023 and is in the amount of $868.86.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 16th day of October, 2023.

Name: _Melissa A Epp_

Title: _Bankruptcy Specialist_

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT (HARTFORD)**

IN RE:

GORDON ALEXANDER CLARK

BK No.: 23-20642-JJT
Chapter 13

---

SANTANDER BANK, N.A., MOVANT

vs.

GORDON ALEXANDER CLARK

DEBTOR(S)

ROBERTA NAPOLITANO, Esq.
TRUSTEE

RESPONDENTS

## AFFIDAVIT REGARDING STANDING

I, _Melissa A Epler_ , declare and state as follows:

1.  I hereby attest that the original promissory note (the "Note") delivered in connection with the acquisition of the real property located at 70 Elm Street, Enfield, CT 06082 in the principal amount of $173,697.22 is under the custody and dominion of Santander Bank, N.A.

2.  I hereby attest that the Note was in custody and dominion of Santander Bank, N.A., prior to the filing of this Motion.

3.  I further attest that the Note is:

    _____ endorsed in blank

    _____ endorsed to _____

    _____X_____ not endorsed

23-16838 BKMFR01

I verify in accordance with 28 U.S.C. §1746 under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _Ocober 16, 2023_____ [date]

_____
[signature]
_Bankruptcy Specialist_
[title]                                                    Return to: BK Dept/B&S

23-16838 BKMFR01

Connecticut Local Form Relief From Stay Worksheet-Real Estate                                    (08/22/2019)

## RELIEF FROM STAY WORKSHEET-REAL ESTATE

☐ Movant believes it is not necessary to complete the information in the worksheet because:

I *Melissa A Exer, Bankruptcy Specialist*
(Name and Title)

Santander Bank, N.A.

(Name of Organization/Corporation/Moving Party) (hereinafter, "Movant") hereby declare (or certify, verify, or state) as follows:

### BACKGROUND INFORMATION

1. Real property address which is the subject of this motion:
   70 Elm Street, Enfield, Connecticut 06082

2. Lender Name: Santander Bank, N.A.

3. Date of Mortgage: March 21, 2008

4. Post-Petition payment address:

5. The manner in which the movant perfected its interest in the property: See Exhibits attached.

6. All other material liens and encumbrances on the property: $494,555.20

   Pursuant to foreclosure action complaint.

### DEBT/VALUE REPRESENTATIONS

7. Total pre-petition and post-petition indebtedness of Debtor(s) to Movant at the time of filing the motion: $173,697.22 as of September 13, 2023
   (Note: this amount may not to be relied on as a "payoff" quotation.)

8. Movant's estimated market value of the real property: $240,000.00

9. Source of estimated valuation: Schedule A/B

### STATUS OF DEBT AS OF THE PETITION DATE

10. Total pre-petition indebtedness of Debtor(s) to Movant as of petition filing date: $173,183.63

    A. Amount of principal: $80,897.23
    B. Amount of interest: $14,382.84
    C. Amount of escrow (taxes and insurance): $45,051.08
    D. Amount of forced placed insurance expended by Movant: $0.00
    E. Amount of fees billed to Debtor(s) pre-petition: $32,524.63

23-16838 BKMFR01

11. Contractual interest rate as of the date of the petition: <u>1.99%</u>
(If interest rate is (or was) adjustable, please list the rate(s) and dates(s) the rate(s) was/were in effect on a separate sheet and attach the sheet as an exhibit to this form; please list exhibit number here:)

12. Only with regard to a post-petition default, explain any additional pre-petition fees, charges or amounts charged to Debtor's/Debtors' account and not listed above:

## <u>AMOUNT OF ALLEGED POST-PETITION DEFAULT (AS OF September 13, 2023)</u>

13. Date last payment was received: <u>June 10, 2019</u>

14. Alleged total number of payments post-petition from filing of petition through payment due on: <u>September 1, 2023 to September 1, 2023</u>

15. List all post-petition payments alleged to be in default:

### <u>SCHEDULE OF PAYMENTS THAT WERE DUE:</u>

| Date Payment Due | Payment Amount Due Post Petition |
|---|---|
| 09/01/2023 | $868.86 |
| Totals: | $868.86 |

### <u>SCHEDULE OF PAYMENTS RECEIVED</u>

| Date | Amount Received | Amount Applied to Principal and Interest | Amount Applied to Escrow | Late Fee Charged (if any) | Amount Applied to Legal Fees or Costs (specify) |
|---|---|---|---|---|---|
| - | - | - | - | - | - |
| Totals: | | | | | |

16. Amount of Movant's Attorney's fees billed to Debtor for the preparation, filing and prosecution of this motion: <u>$1,050.00</u>

17. Amount of Movant's filing fee for this motion: <u>$188.00</u>

18. Only to the extent the movant is seeking payment in the motion, the amount of other Attorney's fees billed to Debtor post-petition: <u>$0.00</u>

19. Only to the extent the movant is seeking payment in the motion, the amount of Movant's post-petition inspection fees: <u>$0.00</u>

20. Only to the extent the movant is seeking payment in the motion, the amount of Movant's post-petition appraisal/broker's price opinion: <u>$0.00</u>

21. Only to the extent the movant is seeking payment in the motion, the amount of forced placed insurance or insurance provided by the Movant post-petition: <u>$0.00</u>

22. Only to the extent the movant is seeking payment in the motion, the amount of sum held in suspense by

Movant in connection with this contract, if applicable: $$0.00

23. Only to the extent the movant is seeking payment in the motion, the amount of other post-petition advances or charges: i.e., taxes, insurance incurred by Debtor, etc.: $0.00

24. Amount and date of post-petition payments offered by the debtor and refused by the Movant:

| $ | Date: |
|---|---|
| N/A | N/A |
|  |  |

## REQUIRED ATTACHMENTS TO MOTION

The following exhibits are attached to the motion is support of the relief requested.

1. Copies of documents that indicate Movant's interest in the subject property. For purposes of example only, a complete and legible copy of the promissory note or other debt instrument together with a complete and legible copy of the mortgage and any assignments in the chain from the original mortgagee to the current moving party.

   Exhibit A, Note; Exhibit B, Mortgage; Exhibit C, Merger Documents

2. Copies of documents establishing proof of standing to bring this Motion.

   See number (1) above

3. Copies of documents establishing that Movant's interest in the real property was perfected. For the purposes of example only, a complete and legible copy of mortgage containing the applicable recording information.

   See number (1) above

## CERTIFICATION AND DECLARATION FOR BUSINESS RECORDS

I certify that the information provided in this worksheet and/or exhibits attached to this worksheet is derived from records that were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters, were kept in the course of the regularly conducted activity; and were made by the regularly conducted activity as a regular practice.

I further certify that copies of any transactional documents attached to this worksheet as required by paragraphs 1, 2, and 3, immediately above, are true and accurate copies of the original documents, I further certify that the original documents are in movant's possession, except as follows:

_____

I/we declare (or certify, swear, affirm, verify or state) that the foregoing is true and correct.

Executed on _October 16, 2023_____ [date]

_Melissa A Egr_____
[signature]

_Bankruptcy Specialist_____
[title]

Santander Bank, N.A._____
[lender]

Subscribed and sworn to before me this _10/16/23_____

_Michelle A Ziegler_____
Notary Public: [name]
My commission expires: _4/27/2026_____

Commonwealth of Pennsylvania - Notary Seal
MICHELLE A ZIEGLER - Notary Public
Berks County
My Commission Expires April 27, 2026
Commission Number 1105656

23-16838 BKMFR01

EXHIBIT A

**Sovereign Bank**

| HOME EQUITY LINE OF CREDIT AGREEMENT ("Agreement") | Date: MARCH 21, 2008 |
| :--- | :--- |
| ☒ New Agreement          ☐ Amendment | |
| Borrower: LILLIAN J. CLARK | Account No.: ███████ |
| Borrower: | Credit Limit:  $    100,000.00 |

"Premises" Secured by Mortgage/Loan Security Agreement:
   70 ELM ST , ENFIELD, CT  06082

| Lot/Book/Volume: | Block/Page: | City Register File #: |
| :--- | :--- | :--- |

We, Sovereign Bank, its successors and assigns, have approved your application for a new Home Equity Line Of Credit Account ("Account") or for an amendment to your existing Account. You, the person(s) who sign(s) as Borrower(s) below, may obtain advances charged to your Account up to your Credit Limit shown above. **Under certain circumstances, we can: (1) terminate your Account, require you to pay us the entire outstanding balance in one payment, and charge you certain fees; (2) refuse to make additional extensions of credit; and (3) reduce your Credit Limit.** These circumstances are described in the paragraph labeled **"Our Absolute Obligation to Make Advances"** which begins on Page 3.

**DEFINITIONS:** As used in this Agreement (unless the context requires otherwise): "Annual Percentage Rate" means the annualized cost of the advances charged to your Account as the result of applying a Periodic Rate to your daily Account balances each billing cycle, "Finance Charge" means the dollar amount the advances charged to your Account will cost you, "New Balance" means the sum of the advances charged to your Account and our charges at the end of the billing cycle, "Periodic Rate" means the cost of the advances charged to your Account as a daily rate, and "Statement" means the monthly statement of our charges for your use of the Account.

**ADDITIONAL DEFINITIONS:** "New Agreement" – if the "New Agreement" box above is checked, this Agreement is for a new Account. "Amendment" – if the "Amendment" box above is checked, this Agreement amends your existing Account.

**AMENDMENT:** If this Agreement is an amendment to your existing Account, the terms and conditions of your existing Account are amended as provided in this Agreement. This Agreement does not extinguish your existing agreement or Account. This Agreement amends your existing Account and agreement to the extent of the provisions contained in it, such as the applicable Annual Percentage Rate, the Margin and Index applied to determine the rate, the computation of the Finance Charge, all other Fees and Charges, as well as the other terms set forth in this Agreement. This Agreement may also amend your Account to add a Fixed Rate Lock Conversion Option, which is described below. In the event of any conflict in terms between this Agreement and your existing agreement, the terms and conditions of this Agreement will control.

**TAX DEDUCTIBILITY:** You should consult a tax advisor regarding the deductibility of interest and charges for your Account.

**CREDIT LIMIT:** This Agreement covers a revolving line of credit for the principal amount specified above as your "Credit Limit" under this Agreement. If this Agreement amends your Credit Limit, then the Credit Limit shown above is the combined amount of the Credit Limit under your existing agreement and any increase or decrease, as applicable, in your Credit Limit resulting from this amendment. You may borrow against this line of credit, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit during the Draw Period described below. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain an advance that will make your Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Account exceeds your Credit Limit, even if we have not yet billed you. While we are processing any payment you make and before we have posted that payment to your Account, your Credit Limit may not reflect that payment. In addition, we do not have to post a payment to your Account if we have reason to believe that the check or other instrument you sent to us as payment will not be honored. We may also delay reinstating your Credit Limit for the amount of any principal payment you make until we reasonably believe that the instrument you used to make your payment has been paid.

**ADVANCES & TERM:** Unless extended by amendment, the length of the period of time during which you can obtain advances on your Account is 15 years and is referred to in this Agreement as the "Draw Period". If this Agreement is an amendment, your current Draw Period will be extended to _____. You can obtain advances during the Draw Period by drawing one of the special checks that we will supply to you to directly obtain advances on your Account. Or, you can use any instrument or device that we may later provide to you to access your Account. You may not obtain an advance on your Account to pay the Minimum Payments due on your Account.

After the Draw Period ends, the repayment period will begin and you will no longer be able to obtain advances on your Account. The length of the repayment period is 15 years from the end of the Draw Period, as it may have been extended, with a final payment due on the following date of maturity: 02/21/2038.

**STATEMENTS:** We will send you a Statement at the end of any billing cycle in which an advance, payment or credit is posted to your Account, we impose any charge, or if you have a balance on your Account.

BANK COPY

**OUR SECURITY INTEREST:** As security for all sums you owe on your Account, including future advances and our finance and other charges, all of the owners of the Premises identified above (called the "Owners") have executed a Mortgage/Loan Security Agreement on the above date in our favor. We will take a security interest in your home. You could lose your home if you do not meet the obligations in your agreement with us. Our rights in the Premises and the obligations of the Owners are more fully described in the Mortgage/Loan Security Agreement. If this Agreement is an amendment, your existing Mortgage/Loan Security Agreement and the lien in our favor on your Premises created by it will continue uninterrupted. If we request, you agree to execute a modification and extension to that Mortgage/Loan Security Agreement on the same date as this Agreement, which increases or decreases the Credit Limit, or extends the Draw Period, or both, as applicable.

**OUR CHARGES FOR YOUR ADVANCES:**

**1. Periodic Finance Charges:** A daily Periodic Finance Charge will be imposed on all advances made to your Account imposed from the date of each advance based on the "average daily balance" method. To get the average daily balance we take the beginning balance of your Account each day, add any new advances and subtract any payments or credits and any unpaid Finance Charges. This gives us the "daily balance". Then we add up all of the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the average daily balance. We compute the Periodic Finance Charge on your Account as follows. We multiply the average daily balance by the number of days in the billing cycle, and multiply the product by the daily Periodic Rate.

    a. Rate Changes. We will determine the Periodic Rate and the corresponding Annual Percentage Rate monthly as follows: We start with an independent index which is the highest rate reflected as the latest U.S. Prime Rate published in the Money Rates table of The Wall Street Journal (the "Index"). We will use the most recent Index value available to us as of the first business day of the calendar month to make any Annual Percentage Rate adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Agreement, we may designate a substitute index after notice to you. To determine the daily Periodic Rate that will apply to your Account, we add - 1.010  percentage points (which includes any applicable Preferred Rate Reduction described below) (the "Margin") to the value of the Index, and then divide the result by the number of days in a year. To obtain the Annual Percentage Rate that corresponds to the Periodic Rate, we multiply the daily Periodic Rate by the number of days in a year. This result is the Annual Percentage Rate that corresponds to the Periodic Rate. This Annual Percentage Rate includes only interest and no other costs.

The Periodic Rate and the corresponding Annual Percentage Rate may increase or decrease as often as once each month. The Periodic Rate and the corresponding Annual Percentage Rate will also increase upon the termination of any applicable Preferred Rate Reduction described below. The maximum **ANNUAL PERCENTAGE RATE** that can apply during the term of this Agreement is the lesser of 18% or the maximum rate allowed by applicable law. The **ANNUAL PERCENTAGE RATE** will never be less than **1.99** %. Except for this **1.99** % minimum and this 18% maximum (or, if less, the maximum rate allowed by applicable law), there is no limit on the amount by which the Annual Percentage Rate or the corresponding Periodic Rate can change during any one-year period. The maximum interest payment for a 30 day period at the highest **ANNUAL PERCENTAGE RATE** permitted hereunder (18%) based on your Credit Limit shown above would be $     1,479.45

Adjustments to the Periodic Rate and the corresponding Annual Percentage Rate resulting from changes in the Index will take effect monthly, beginning with the first day of the first billing cycle in the calendar month.

**Preferred Rate Reduction:** If you have asked us to automatically deduct your Minimum Payment from your Sovereign checking, money market or statement savings account, your Margin, Periodic Rate and your Annual Percentage Rate shown above reflect a reduction in the Margin (the amount of this reduction is the Preferred Rate Reduction). If you authorize us to automatically deduct your minimum monthly payments from a Sovereign Premier, Business Owner Premier, Partnership, Team Member Private or Team Member Checking, or Premier Money Market Savings or other qualifying account, your margin (and Annual Percentage Rate) has been reduced by .50%. If you authorize us to automatically deduct your minimum monthly payments from any other Sovereign deposit account, your margin (and Annual Percentage Rate) has been reduced by .25%. If the automatic deduction service stops for any reason, your Margin, and thus your Annual Percentage Rate, will increase by 0.250 or 0.500 percentage points, as applicable, and your corresponding Periodic Rate will also increase. You may stop this automatic deduction service by telling us or by closing your Sovereign checking, money market or statement savings account. We may stop this automatic deduction service if you do not maintain enough funds in your checking, money market or statement savings account to pay your Minimum Payment.

    b. The Initial Rate. Based on the Index and Margin and any applicable Preferred Rate Reduction in effect on the day you signed this Agreement, the initial **ANNUAL PERCENTAGE RATE** is  4.240  %, which corresponds to an initial daily Periodic Rate of  0.01162 %.

**Loan Protection Plan(s):** If you have purchased the optional Sovereign Loan Protection Program, additional fees will be charged. Please see your Loan Protection Plan Agreement and related disclosures for additional details.

**2. Late Charges:** If your Minimum Payment is not received within 15 days of the Payment Due Date shown on your Statement, we will impose and you agree to pay a Late Charge of 10% of the Minimum Payment or $20, whichever is greater.

BANK COPY

**3. Application Fee:** We will charge a non-refundable fee of $250 only when the Account is opened and used for Swing Line purposes. *(A Swing Line is interim financing secured by the existing property and is used for the purchase of a new residence prior to the purchase of the existing property.)*

**4. Termination Fee:** If you request that we close your Account within 30 months of the Date of this Agreement shown above and you were not required to pay any closing costs when the Account was opened, we will impose a Termination Fee of $220. We will waive this fee if your Account is refinanced with us or if the Account was used for Swing Line purposes.

**5. Fixed Rate Lock Fee:** We may charge a fee of $50 to your Revolving Account for each Fixed Rate Lock. This fee is a FINANCE CHARGE. Please see the paragraph below entitled "Fixed Rate Lock Conversion Option."

**6. Annual Fee:** You will be charged and you agree to pay an Annual Fee of $50.00 during th e Draw Period. The Annual Fee will be charged in the 13th month after you open the Account and in about the same billing cycle of each following year during the Draw Period. If you have a Sovereign Premier, Business Owner Premier, Partnership, Team Member Private or Team Member Checking or other qualifying account, your Annual Fee will be $0. If you close your Sovereign Premier, Business Owner Premier, Partnership, Team Member Private or Team Member Checking or other qualifying account you will be charged an Annual Fee of $50.00 during the Draw Period.

**7. Other Charges:** We impose the following additional charges on your Account:
a.    We impose a Return Item Charge of $30 whenever your payment is returned for insufficient funds or any other reason.
b.    We will charge you $20.00 for each hour (or portion of an hour) of research that we perform at your request, unless done in connection with a proper written notice of a billing error.
c.    We will charge and you agree to pay an overlimit fee of $30, when any special check or other request for an advance would cause you to exceed the Credit Limit, whether or not we honor your request.
d.    If a traditional appraisal was obtained and you request a copy in the first 90 days from the date this loan was closed, you will pay us a charge at the rate of $5 per page.
e.    If you request a copy of any document, including a special check or a Statement, we will impose a charge of $5 per page for each copy you request. If your request is related to a billing error (see "Your Billing Rights" notice) and an error is found, we will reverse any photocopying charges.
f.    We will charge and you agree to pay a fee of $25 whenever you request that we stop payment of a special check or other request for an advance on your Account.
g.    We charge you for our actual costs of Credit Reports and Appraisals incurred in investigating whether any condition permitting us to temporarily suspend credit availability or reduce the Credit Limit on your Account continues to exist.
h.    The current applicable fee to discharge the Mortgage or terminate any UCC Financing Statement securing this extension of credit and any extension or modification of it will be added to the payoff amount. Except as otherwise required by law, this fee will be waived if you agree to record the discharge of the mortgage or terminate any UCC Financing Statement yourself.
i.    If you request us to send you a payoff statement by facsimile transmission, we will charge you our then-current fee (currently $20) that will be added to your payoff amount.

**MINIMUM PAYMENT:** You promise to pay the advances and our Finance Charges and other charges as provided in this Agreement. To the extent your payments reduce the outstanding balance to an amount less than the Credit Limit, they restore your credit availability during the Draw Period. Whenever a balance is outstanding, each month you must pay us a Minimum Payment, which we must receive by the Payment Due Date shown on your Statement. The amount of any Minimum Payment or any other payment that is applied to principal or interest (Finance Charge) on your Account may vary, based upon when payments are received. You may at any time pay more than the Minimum Payment without incurring a penalty, but if you request that we close your Account under the circumstances set forth in subparagraph 4 of the paragraph of this Agreement entitled "Our Charges For Your Advances", we will impose a Termination Fee as set forth in that subparagraph. If you make a payment that exceeds your Minimum Payment, or make an additional payment when no payment is then due, we will apply the excess or additional payment amount to any balance in the Revolving Account portion of your Account before we apply it to any Fixed Rate Lock(s) you may have established on your Account.

**RECEIPT OF PAYMENTS:** All payments must be made by check, automatic account debit, electronic funds transfer, money order, or other instruments in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address prior to 3:00 PM Eastern Standard Time on any business day will be credited to your Credit Line as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Credit Line, but crediting may be delayed for up to five (5) days after receipt. If you have selected to make your payments by automatic account debit, payment transfers will be processed on the date the payment is due monthly. If the scheduled date falls on a Sunday or a bank holiday, the transfer will be processed on the next business day. If funds for the payment are uncollected or insufficient on the transfer date, an insufficient funds charge may be assessed. If the payment is returned to us, the payment will be your responsibility for that month. If you do not maintain sufficient funds to process your payment transfer, your preauthorized transfer may be cancelled and any Preferred Rate Reduction may be terminated. Payments received at any of our community banking offices on a business day (Monday - Friday) before the cut off time posted at that office will be credited to your Account as of the date of receipt. Payments received on a non-business day (Saturday, Sunday or a bank holiday) or after the posted cut off time will be credited to your Account as of the following business day.

**ELECTRONIC PAYMENT:** Each time you make a payment by check, we may convert your check into an electronic payment. By sending us a check, you authorize us to convert your check. When we do this, the funds may be withdrawn from your account more quickly than if we processed your original check so always make sure you have enough funds in your account to make your payment. After we convert it, your check will not be sent back to you because we are required to destroy it. We do, however, keep an electronic copy. If you do not wish us to convert your check or if you need more information, please call us at 877-768 2265.

066.mdf - rev(07/07)                              - 3 -

**PAYMENT OPTIONS:**

**Payment Option 1:** ☐ If the box preceding this sentence is checked, for any billing cycle during the Draw Period, your Minimum Payment will be equal to the sum of (i) all accrued Finance Charge and other charges for the billing cycle (minimum $20), plus (ii) optional Loan Protection Plan(s) fees, if any, plus (iii) any other fees and charges and any amounts past due or in excess of your Credit Limit. For any billing cycle after the end of the Draw Period, your Minimum Payment will be equal to the sum of (i) 1/180th of the outstanding balance of principal at the end of the Draw Period, or $20, whichever is more, plus (ii) all accrued Finance Charge for the billing cycle, plus (iii) optional Loan Protection Plan(s) fees, if any, plus (iv) any other fees and charges and any amounts past due. You must also pay any Late Charges then outstanding. The amount of your Minimum Payments may increase if the Annual Percentage Rate increases. **NOTE: Although interest-only payments may be less on a monthly basis, they retire no principal, may prolong the obligation, and result in greater total expenses over the life of the loan.**

**Payment Option 2:** ☒ If the box preceding this sentence is checked, for any billing cycle during the Draw Period, your Minimum Payment will be equal to the sum of (i) 1/240th of the average daily balance plus all accrued Finance Charge at the end of the billing cycle, or $20, whichever is more (or the entire balance if less than $20), plus (ii) optional Loan Protection Plan(s) fees, if any, plus (iii) any other fees and charges and any amounts past due or in excess of your Credit Limit. For any billing cycle after the end of the Draw Period, your Minimum Payment will be equal to the sum of (i) 1/180th of the outstanding balance of principal at the end of the Draw Period, or $20, whichever is more, plus (ii) all accrued Finance Charges for the billing cycle, plus (iii) optional Loan Protection Plan(s) fees, if any, plus (iv) any other fees and charges and any amounts past due. You must also pay any Late Charges then outstanding. The amount of your Minimum Payments may increase if the Annual Percentage Rate increases.

**Change to Payment Option:** After you choose a Payment Option, you may ask us to change your Payment Option during the Draw Period, as long as we consider your Account to have been in good standing at all times. Any changes in your Payment Option must be for a period of not less than 12 months.

**RIGHT OF SET OFF:** You authorize us to apply money from your deposit account(s) with us, now or in the future, to pay all or any part of any amount past due under this Agreement, without notice.

**AUTOMATIC PAYMENT AUTHORIZATION:** If an account number is inserted in the following space, you authorize us to deduct the amount of your Minimum Payment on the Payment Due Date shown on your Statement from your checking, money market or statement savings account; (Account Number: 10020876388_____ ) with us, or with _____ and to make the payment then due on your Account.

**PROPERTY INSURANCE:** You must obtain and maintain adequate insurance against fire, flood and such other reasonable risks to the Premises as we require. This insurance protects your interests and our interests in the Premises while this Agreement is in effect. YOU MAY OBTAIN SUCH INSURANCE FROM ANY AGENT, BROKER OR INSURANCE COMPANY OF YOUR CHOICE which is licensed to do business in the state where the Premises is located, and your choice of insurance agent, producer, broker or insurance company will not affect our credit decision. However, we reserve the right to refuse to accept any insurance company or policy for reasonable cause. The policy must name us as "mortgagee" and provide us with not less than 30 days' notice of any cancellation or reduction in coverage. You must provide us with evidence of such insurance coverage promptly after our request. In the event of an insured loss, you agree to promptly advise us of the loss and to file a proof of loss with the insurance company. You appoint us your attorney-in-fact, in your name or in ours, to file a proof of loss if you fail or refuse to do so, and to endorse your name to any check, draft or other instrument in payment of an insured loss. We will allow you and the Owners to apply the insurance proceeds to repair the Premises but only if we have not previously declared your Account to be in default, temporarily reduced your Credit Limit or frozen your Account, and the repairs are done properly.

**OUR ABSOLUTE OBLIGATION TO MAKE ADVANCES:** Except as provided below, our agreement to make advances to you during the Draw Period is an absolute obligation on our part. This means we MUST make each and every advance you properly request during the Draw Period, up to your Credit Limit, under this Agreement. However, our absolute obligation to make advances to you during the Draw Period ends when any of the following happens:

**1. We declare your Account to be in default,** which we can do when:
a. You fail to meet the repayment terms of this Agreement for any outstanding balance.
b. There is fraud or a material misrepresentation by you in connection with your Account.

c. Any action or inaction by you adversely affects our security for your Account, or any right we have in such security. Among other things, such action or inaction would include:

   - the sale or transfer of title to the Premises without our consent,
   - your abandonment of the Premises, which adversely affects our security in the Premises,
   - your failure to maintain the required property insurance coverages on the Premises,
   - your failure to maintain the Premises in good condition and repair, which adversely affects our security in the Premises,
   - your permitting anything to be done to the Premises that would constitute waste or destruction of the Premises, or that would render the Premises unsafe or unfit for human habitation (such as by bringing or storing hazardous or toxic substances on the Premises), which adversely affects our security in the Premises,

- your doing of any unlawful act that subjects the Premises to seizure by governmental authorities,
- your failure to pay taxes on the Premises,
- your permitting any liens to be filed on the Premises which are superior to ours,
- foreclosure by any prior mortgagee or lienholder which adversely affects our interest in the Premises,
- a taking of all or part of the Premises in a proceeding in eminent domain or condemnation,
- the death of the sole Borrower obligated on your Account, or if there are more than one of you, the death of any of you or any Owner of the Premises that results in a transfer of title to the Premises to a person who is not a party to our security interest in the Premises or that otherwise adversely affects our security in the Premises, or,
- if the Premises is a cooperative apartment, you break any of the promises you have made under the proprietary lease of the Premises, your proprietary lease is cancelled or terminated, the cooperative corporation fails to pay when due any mortgage payments, leasehold payments and/or real estate taxes it is obligated to pay, or to insure the building in which the Premises is located, or foreclosure, bankruptcy or insolvency proceedings are brought by or against the cooperative corporation, and any of such adversely affects our security or any right we have in the security.

If one or more of the above events occurs, we can temporarily or permanently reduce your Credit Limit or suspend your ability to obtain advances, or we can declare your Account to be in default. However, we can declare your Account in default only by personally delivering or mailing to you a written Notice of Default. Our Notice of Default will become effective when we personally deliver it to you or place it in the mails, even though you might not receive our mailed Notice of Default. If we declare your Account in default we will immediately terminate credit availability on your Account. If we choose, we may also send you a Notice of Intention to Take Action, advising you that if you do not cure the default within the time period then provided by law, we will demand repayment of the entire outstanding balance in one immediate payment and exercise our security interest and right of set-off against any of your property, including deposit accounts, then in our possession (unless prohibited by applicable law).

Except as otherwise provided below, if we don't receive payment in full, we may also foreclose upon the Premises and take any other collection action allowed to us by law. You agree to pay our court costs and collection fees we incur in the collection and enforcement of your Account, as well as our reasonable attorney's fees, to the extent permitted by law, if we refer your Account to an attorney or collection agency for collection. You agree to pay Finance Charges at the variable Annual Percentage Rate provided in this Agreement on the outstanding balance of your Account until we receive payment in full, even if we have demanded payment in full or obtained a judgment against you. If you cure the default in the manner provided by law you will restore your right to make Minimum Payments each month as if you had never been in default, but you will not restore your right to obtain additional advances on your Account.

If one or more of the above events occurs, we may elect to waive our right to declare your Account in default. If we waive that right, we will remain absolutely obligated to make all advances you properly request on the Account during the Draw Period. However, that waiver does not bind us if a similar or different event occurs later. At that time, we have the right to decide whether to declare your Account in default.

**For New Hampshire Borrowers**: If we don't receive payment in full, we may also foreclose upon the Premises and take any other collection action allowed to us by law. You agree to pay us all reasonable costs we incur to collect this debt or realize on any security, to the extent permitted by law. This includes court costs, attorney fees for services rendered by an attorney for collection when the attorney is not our salaried employee, and/or collection agency fees. However, if you prevail in any action, suit or proceeding we bring or in an action you bring, reasonable attorneys' fees shall be awarded to you. If you successfully assert a partial defense, setoff, recoupment or counterclaim to an action brought by us, the court may withhold from us the entire amount or such portion of the attorneys' fees as the court deems appropriate. You agree to pay Finance Charges at the variable Annual Percentage Rate provided in this Agreement on the outstanding balance of your Account until we receive payment in full, even if we have demanded payment in full or obtained a judgment against you. If you cure the default in the manner provided by law you will restore your right to make Minimum Payments each month as if you had never been in default, but you will not restore your right to obtain additional advances on your Account.

**2. All of you request final termination of your Account.** Final termination at the request of all of you will become effective as soon as we terminate your ability to obtain advances and all sums owed to us and our charges are paid in full. At that time, we will terminate the security interest or provide appropriate documents to you to enable you to terminate the security interest in the Premises.

**3. You or we temporarily reduce your Credit Limit or temporarily suspend your ability to obtain advances,** which can be done only if any one or more of the following events occur:
a. Any of you notify us, in person or in writing, of an intention to terminate your Account, or that you do not want to be obligated for any advances obtained or to be obtained by any others on the Account (except in connection with a good faith billing dispute), or any Owner advises us of an intention not to obligate the Premises for existing or future advances. We will treat a request for termination by less than all of you, or by an Owner who is not also a Borrower, as a request for temporary suspension. Such suspension will become effective as soon as we can reasonably act to stop new advances from being made on your Account. However, we may honor any and all requests for advances which were made or are dated prior to that time.

b. Any of the following things happen and we choose to freeze your Account by temporarily reducing your Credit Limit or suspending your ability to obtain advances:
    (1) The value of the Premises declines significantly below its original appraised value.
    (2) We reasonably believe that you will be unable to fulfill the repayment obligations under this Agreement because of a material change in your financial circumstances.

066.mdf - rev(07/07)                                    - 5 -

(3) We are precluded by government action from imposing the Annual Percentage Rate provided in this Agreement.

(4) The priority of our security interest in the Premises is adversely affected by government action to the extent that the value of our security interest is less than 120 percent of the Credit Limit.

(5) You are in default of any of the following "material obligations" under this Agreement:

    (a) Any of you fails to honor your obligations on any prior security interest in the Premises.

    (b) Any of you does not pay any other obligation you owe to us or to others as and when that obligation comes due, or a proceeding is begun by or against any of you under the Federal Bankruptcy Code.

    (c) Any of you are incarcerated or declared legally incompetent.

    (d) Any of you fails to promptly provide us with satisfactory financial information which we may request from time to time or to cooperate with us in appraising the Premises which we may elect to do from time to time.

    (e) If there are more than one of you, the death of the person on whose income we primarily relied in agreeing to open the Account for you.

    (f) You move out of the Premises or convert the Premises from your residence or vacation home to an investment or rental property.

    (g) You permit an intervening lien to be filed against the Premises that would take priority over future advances made by us.

(6) We are notified by our regulatory agency that continued advances on your Account constitute an unsafe and unsound practice.

(7) The maximum Annual Percentage Rate is reached.

(8) An event occurs which gives us the right to declare your Account to be in default.

We will send you a Notice Of Credit Freeze not later than three business days after we take such action, advising you of the specific reasons for our action. Our Notice Of Credit Freeze will advise you that you may request reinstatement of your credit privileges when the condition which led to our action no longer exists (and provided that no other condition listed above exists that would allow us to freeze your Account by temporarily reducing your Credit Limit or suspending your ability to obtain advances).

**4. The Draw Period Ends.**

**YOUR OBLIGATIONS CONTINUE ON TEMPORARY SUSPENSION:** Upon temporary suspension, whether by you or by us, you remain obligated to repay all amounts owed to us as provided in this Agreement, including our Finance Charges and other charges. This means you must continue to make at least the Minimum Payments each month under the terms of this Agreement.

**REINSTATEMENT:** You may request reinstatement of the credit privileges on your Account for the remainder of the Draw Period at any time after the condition that permitted us to temporarily reduce your Credit Limit or suspend your ability to obtain advances ceases to exist (provided that no other condition exists that would allow us to freeze your Account by temporarily reducing your Credit Limit or suspending your ability to obtain advances). If you request reinstatement you may be required to pay any reasonable appraisal and credit report fees we actually incur in investigating whether any condition permitting the freeze continues to exist. We will reinstate credit privileges on your Account when we find that those conditions have ceased to exist. If any one of you or any Owner of the Premises requested temporary suspension of the Account, we will reinstate your Account for the remainder of the Draw Period if all of you advise us in writing of a desire to reinstate the Account. However, we may refuse to reinstate your Account until we are assured that our rights in any security for your Account have not been adversely affected by the temporary freeze.

**TAXES; REPAIRS:** You agree to pay all taxes on the Premises and to maintain the Premises in good condition and repair.

**OTHER ADVANCES:** If you fail to purchase property insurance, or do not pay taxes when they come due, or do not properly maintain the Premises, we may, if we choose (but without any obligation on our part), advance sums on your behalf for these purposes in order to protect our interest in the Premises. Any advances we make on your behalf will not excuse you from your failure to honor your promises and obligations in this Agreement. The amounts we advance on your behalf will be charged to your Account in the same manner as any other advance made by us to you hereunder.

**OWNERSHIP OF SPECIAL CHECKS:** You agree that the special checks and any other credit instruments or devices which we may supply to you to use in connection with your Account are our property. Unused special checks and any other credit instruments or devices must be returned to us immediately upon demand. We will retain all special checks and other credit instruments you draw in connection with your Account.

**PROOF OF ADVANCES:** Your Statements will indicate the current status of your Account and identify the transactions posted during the billing cycle. If you need evidence of an advance or other transaction, we will provide you with a photographic or other reasonable reproduction of any special check or other document that you request. You agree that such evidence will be satisfactory to you for all purposes.

**REFUSAL TO HONOR REQUESTS FOR ADVANCES:** We will not be responsible if, for any reason, anyone fails or refuses to honor special Account checks or any other credit instrument or device we provide to you to obtain advances on your Account.

**AMENDMENTS:** We may amend this Agreement by entering into a separate written agreement with you, or by making a change that is either beneficial to you or insignificant. However, you will be responsible for increases in taxes and property insurance premiums on the Premises. If we temporarily reduce the rate or fees charged on your Account below those contained in this Agreement, we can impose the agreed rate or fees by giving you notice of the change in terms.

BANK COPY

The paragraphs in this Agreement that are entitled "Advances & Term," "Our Charges for Your Advances, #1. Periodic Finance Charges" "Payment Options," "Change to Payment Option" and "Our Absolute Obligation to Make Advances" assume that you have not elected the Fixed Rate Lock Conversion Option described below.  However, if you elect the Fixed Rate Lock Conversion Option, the following terms modify the above-listed paragraphs, as described below:

## FIXED RATE LOCK CONVERSION OPTION:

After you open your Home Equity Line of Credit Account, you may ask us to change your variable interest rate to a fixed rate of interest on all or a portion of your principal balance ("Fixed Rate Lock"), as long as we consider your Account to have been in good standing at all times. This option will be available only during the Draw Period.  If there is more than one Borrower on your Account, all of you agree that we may establish a Fixed Rate Lock upon the request of any one or more of you.

The minimum amount of your principal balance for which you may elect a Fixed Rate Lock is $5,000. The repayment term for any Fixed Rate Lock must be at least 12 months and may not exceed 180 months or the maturity date of your Home Equity Line of Credit Account, whichever is earlier. You may have up to four Fixed Rate Locks outstanding on your Account at any one time.  However, you may not transfer a Fixed Rate Lock balance to a new Fixed Rate Lock balance for a period of 12 months following the establishment of the Fixed Rate Lock balance, and you may not transfer additional amounts to any Fixed Rate Lock once it has been . established. The portion of your credit line that is not transferred to a Fixed Rate Lock is called your Revolving Account. The amount of each Fixed Rate Lock will reduce your available credit on your Revolving Account. As you repay the principal balance of each Fixed Rate Lock, your available credit on your Revolving Account will increase as a result.

The fixed rate of interest applicable to a Fixed Rate Lock will be determined at the time of each Fixed Rate Lock request and will be based on our current market rate at that time for Fixed Rate Home Equity Loans, except that the rate applicable to a Fixed Rate Lock will never be greater than 18% **ANNUAL PERCENTAGE RATE** or less than 1.99% **ANNUAL PERCENTAGE RATE**.  The rate may depend on a number of factors, including loan amount, loan-to-value ratio, property type, credit history and the automatic payment deduction option, if any, you have selected. Once the rate of each Fixed Rate Lock has been established, that rate will not change.  A recent **ANNUAL PERCENTAGE RATE** that we have charged on a $10,000 Fixed Rate Home Equity loan was 8.09%.  This Annual Percentage Rate included only interest and not other costs. As an example, the monthly payment for a Fixed Rate Lock of $10,000 at 8.09% **ANNUAL PERCENTAGE RATE** for a period of 120 months would be $121.80. The amount of each Fixed Rate Lock payment will be included in your minimum Payment Due on your monthly statement.

Regardless of the Draw Period Payment Option you select on your Revolving Account, repayment of each Fixed Rate Lock will be based on substantially equal monthly payments for a term you choose (but not to exceed 180 months or the maturity date on the Account, whichever is earlier) in an amount sufficient to repay the principal balance of each Fixed Rate Lock, together with interest at the Annual Percentage Rate for each Fixed Rate Lock.  A daily periodic Finance Charge will be imposed on your Fixed Rate Lock balance from the date each Fixed Rate Lock is established, based on the "average daily balance" method.  The amount of your final payment for each Fixed Rate Lock may vary, depending on whether your monthly payments are received early, on time, or following their due dates. After each Fixed Rate Lock is established, the minimum monthly Payment Due on your Account will include the minimum monthly payment for your Revolving Account described above, plus the minimum monthly payments for all Fixed Rate Locks outstanding. The minimum monthly Payment Due for your Account will be reflected on your monthly billing statement. Payments received will be applied to the minimum monthly payment for each Fixed Rate Lock in the order each Fixed Rate Lock was established.  We may charge a fee of $50 to your Revolving Account for each Fixed Rate Lock. This fee is a **FINANCE CHARGE**.

**BINDING EFFECT:** If more than one of you signs as Borrower, each of you will be liable, separately and together, for all advances obtained on the Account. All of you agree that any one or more of you may obtain advances on the Account. This Agreement obligates you and your estate, heirs and personal representatives and benefits us and our successors and assigns. We may add or release parties, or permit the addition or substitution of collateral subject to our security interest, or modify, extend or amend this Agreement without in any way affecting your obligations on this Agreement.

**CONTINUED EFFECTIVENESS:** If we honor special Account checks or other requests for advances after your death or declaration of legal incompetency, but before we receive actual written notice of either event, those advances will be valid, legal and binding obligations on you and your estate, heirs and personal representatives.

**IRREGULAR PAYMENTS; DELAY IN ENFORCEMENT:** We may accept partial or late payments of sums due on your Account without losing any of our rights under this Agreement.  We may even accept checks or drafts marked "paid in full" or with similar language indicating that our accepting the payment would be in full satisfaction of your outstanding balance, without being bound by that language or losing any of our rights under this Agreement.  Any such payments must be mailed to: Sovereign Bank, Mail Stop 10-421-CP2, Consumer Finance, P.O. Box 12646, Reading, PA 19612. We can delay enforcing our rights under this Agreement without losing them.

**CREDIT REPORTS AND APPRAISALS:** From time to time, we may review your Account to determine whether, in our reasonable opinion, a material change has occurred in your financial circumstances that would leave you unable to fulfill the repayment obligations under this Agreement.  As part of such reviews, we may obtain additional credit reports on you, inspect or reappraise the Premises, and request additional financial information from you.  You agree to cooperate with us in performing such reviews and to promptly provide satisfactory financial information to us.

**TRANSFER AND ASSIGNMENT:** Your rights under this Agreement belong only to you. You cannot transfer or assign them to anyone else. We may transfer and assign our rights and obligations under this Agreement and the Mortgage/Loan Security Agreement at any time without your consent. The person to whom we transfer and assign this Agreement and the Mortgage/Loan Security Agreement shall be entitled to all of our rights and subject to all of our obligations under this Agreement and the Mortgage/Loan Security Agreement. None of your obligations shall be affected by our transfer and assignment.

**APPLICABLE LAW; ENTIRE AGREEMENT:** You agree that this Agreement is to be governed by Pennsylvania law (without regard to principles of conflicts of law or choice of law), except and to the extent governed by federal law applicable to federal savings banks, including 12 USC 1463 and 1464. If this is a New Agreement, it is the entire agreement between you and us. If any provision of this Agreement is held to be void or unenforceable, the rest of this Agreement shall remain in effect.

**YOU ACKNOWLEGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT.** PLEASE RETAIN A COPY FOR YOUR RECORDS.

_____ (SEAL)          _____ (SEAL)
Borrower                                   Borrower
LILLIAN J. CLARK

_____ (SEAL)          _____ (SEAL)
Borrower                                   Borrower

                                          BANK COPY

## YOUR BILLING RIGHTS - KEEP THIS NOTICE FOR FUTURE USE.

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

### Notify Us In Case of Errors or Questions About Your Bill

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the following address;

Sovereign Bank
Mail Stop: 10-421-CX2
450 Penn Street
Reading, PA 19602

Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error.
  If you need more information, describe the item you are not sure about.

### Your Rights and Our Responsibilities After We Receive Your Written Notice

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

* * * * * * * * * * * * * * *

BANK COPY

### INDEX

| TOPIC | PAGE |
|---|---|
| Additional Definitions | 1 |
| Advances & Term | 1 |
| Amendment | 1 |
| Amendments | 6 |
| Applicable Law | 8 |
| Annual Fee | 3 |
| Application Fee | 3 |
| Automatic Payment Authorization | 4 |
| Binding Effect | 7 |
| Continued Effectiveness | 7 |
| Credit Limit | 1 |
| Credit Reports And Appraisals | 7 |
| Definitions | 1 |
| Delay In Enforcement | 7 |
| Electronic Payment | 3 |
| End Of Obligation To Make Advances | 4, 5 |
| Entire Agreement | 8 |
| Finance Charges | 2 |
| Fixed Rate Lock Conversion Option | 7 |
| Fixed Rate Lock Fee | 3 |
| Initial rate | 2 |
| Irregular Payments | 7 |
| Late Charges | 2 |
| Loan Protection Plan(s) | 2 |
| Minimum Payment | 3 |
| Other Advances | 6 |
| Other Charges | 2 |
| Our Absolute Obligation To Make Advances | 4, 5 |
| Our Charges for Your Advances | 2, 3 |
| Our Security Interest | 2 |
| Ownership Of Special Checks | 6 |
| Payment Options | 4 |
| Preferred Rate Reduction | 2 |
| Proof Of Advances | 6 |
| Property Insurance | 4 |
| Rate Changes | 2 |
| Receipt of Payments | 3 |
| Refusal To Honor Requests For Advances | 6 |
| Reinstatement | 6 |
| Right Of Set Off | 4 |
| Statements | 1 |
| Tax Deductibility | 1 |
| Taxes; Repairs | 6 |
| Termination Fee | 3 |
| Transfer And Assignment | 8 |
| Your Billing Rights | 9 |
| Your Obligations Continue On Temporary Suspension | 6 |

BANK COPY

VL 2392   PG 047

EXHIBIT B

Record and Return To:
Fiserv Lending Solutions
P.O. BOX 2590
Chicago, IL 60690


CLARK, LILLIAN J

### CONNECTICUT
### OPEN-END MORTGAGE
### (Securing Future Advances)

**THIS MORTGAGE** is made on MARCH 21, 2008.  The mortgagor is LILLIAN J CLARK.

This Mortgage is given to SOVEREIGN BANK, a federal savings bank whose address is 450 Penn Street, Reading, PA 19602 ("Lender").  In this Mortgage, the terms "you," "your," and "yours" refer to the mortgagor(s).  The terms "we," "us" and "our" refer to the Lender.

Pursuant to a Home Equity Line of Credit Agreement dated the same date as this Mortgage ("Agreement"), you may incur maximum unpaid loan indebtedness (exclusive of interest thereon) in amounts fluctuating from time to time up to the maximum principal sum outstanding at any time of One Hundred Thousand and no/100 Dollars (U.S. $ 100,000.00).  The Agreement is a consumer revolving loan agreement.  The Agreement provides for monthly payments of principal and/or interest and provides for a final scheduled installment due and payable not later than on 02/21/2038.   The interest rate under the Agreement may increase or decrease from time to time, as set forth more fully in the Agreement, and, as a result, the dollar amount of the monthly payments of  principal and/or interest required under the Agreement may also increase or decrease.  The Agreement is incorporated into this Mortgage by reference, and all references to interest in this Mortgage shall be to the variable rate of interest set forth in the Agreement. Excerpts from the Agreement are recorded with this Mortgage as EXHIBIT A.

Pursuant to the terms of the Agreement, any person signing the Agreement may request loan advances from time to time (even if that person has not signed this Mortgage), subject to the limitations contained in the Agreement and subject to the maximum credit limit set forth in the Agreement.  All such loan advances shall be recorded in our books and records and shall be due and payable no later than the maturity date set forth above in this Mortgage.  All such loan advances, with interest thereon, will be secured by this Mortgage up to the maximum credit limit referred to above.  You agree that all loan advances made to any person signing the Agreement pursuant to the limitations and requirements of the Agreement shall be considered loan advances made to or for the benefit of each or any of you, even if you did not sign the Agreement and even if you did not request the loan advances.

You agree that this Mortgage shall continue to secure all sums now or hereafter advanced under the terms of the Agreement including, without limitation, such sums that are advanced by us whether or not at the time the sums are advanced there is any principal sum outstanding under the Agreement.  The parties hereto intend that this Mortgage shall secure unpaid balances, and all other amounts due to us hereunder and under the Agreement.

This Mortgage secures to us: (a) the repayment of the debt evidenced by the Agreement, with interest, and all refinancings, renewals, extensions and modifications of the Agreement; (b) the payment of all other sums, with interest, advanced under this Mortgage to protect the security of this Mortgage; and (c) the performance of your covenants and agreements under this Mortgage and the Agreement.  For this purpose and in consideration of the debt, you do hereby mortgage, grant and convey to us and our successors and assigns the following described property located in HARTFORD County, Connecticut;

### PROPERTY DESCRIPTION
That certain piece or parcel of land, and the buildings and improvements thereon:
In the Town of: ENFIELD
County of: HARTFORD
and State of: CONNECTICUT
and being more particularly described in a deed recorded in
Book    767          Page   310
with Town Clerk of HARTFORD County, City of ENFIELD
which property is more commonly known as 70 ELM ST , ENFIELD, CT  06082 ("Property Address");

1

**TO HAVE AND TO HOLD** this property unto us and our successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Mortgage. All of the foregoing is referred to in this Mortgage as the "Property."

**YOU COVENANT** that you are lawfully seized of the estate hereby conveyed and have the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. You warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**YOU AND WE** covenant and agree as follows:

**1.     Payment of Principal, Interest and Other Charges.** You shall pay when due the principal of and interest owing under the Agreement and all other charges due hereunder and due under the Agreement.

**2.     Application of Payments.** Unless applicable law or the Agreement provides otherwise, all payments received by us under the Agreement and Section 1 shall be applied by us in any order we choose.

**3.     Prior Mortgages; Charges; Liens.** You shall perform all of your obligations under any mortgage, deed of trust or other security instrument with a lien which has priority over this Mortgage, including your covenants to make payments when due. You shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Mortgage, and leasehold payments or ground rents, if any. Upon our request, you shall promptly furnish to us all notices of amounts to be paid under this paragraph and receipts evidencing any such payments you make directly. You shall promptly discharge any lien (other than a lien disclosed to us in your application or in any title report we obtained) which has priority over this Mortgage.

**4.     Hazard Insurance.** You shall keep the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which we require insurance. This insurance shall be maintained in the amounts and for the periods that we require. You may choose any insurer reasonably acceptable to us. Insurance policies and renewals shall be acceptable to us and shall include a standard mortgagee clause. If we require, you shall promptly give us all receipts of paid premiums and renewal notices. If you fail to maintain coverage as required in this section, you authorize us to obtain such coverage as we in our sole discretion determine appropriate to protect our interest in the Property in accordance with the provisions in Section 6. You understand and agree that any coverage we purchase may cover only our interest in the Property and may not cover your interest in the Property or any personal property therein. You also understand and agree that the premium for any such insurance may be higher than the premium you would pay for such insurance. You shall promptly notify the insurer and us of any loss. We may make proof of loss if you do not promptly do so. We may also, at our option and on your behalf, adjust and compromise any claims under the insurance, give releases or acquittances to the insurance company in connection with the settlement of any claim and collect and receive insurance proceeds. You appoint us as your attorney-in-fact to do all of the foregoing, which appointment you understand and agree is irrevocable, coupled with an interest with full power of substitution and shall not be affected by your subsequent disability or incompetence. Insurance proceeds shall be applied to restore or repair the Property damaged, if restoration or repair is economically feasible and our security would not be lessened. Otherwise, insurance proceeds shall be applied to sums secured by this Mortgage, whether or not then due, with any excess paid to you. If you abandon the Property, or do not answer within 30 days our notice to you that the insurer has offered to settle a claim, then we may collect and use the proceeds to repair or restore the Property or to pay sums secured by this Mortgage, whether or not then due. The 30-day period will begin when notice is given. Any application of proceeds to principal shall not require us to extend or postpone the due date of monthly payments or change the amount of monthly payments. If we acquire the Property at a forced sale following your default, your right to any insurance proceeds resulting from damage to the Property prior to the acquisition shall pass to us to the extent of the sums secured by this Mortgage immediately prior to the acquisition. You shall not permit any condition to exist on the Property which would, in any way, invalidate the insurance coverage on the Property.

**5.     Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** You shall not destroy, damage or substantially change the Property, allow the Property to deteriorate, or commit waste. We may declare a default if any forfeiture action or proceeding, whether civil or criminal, is begun that in our good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Mortgage or our security interest. You may cure such a default, as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in our good faith determination, precludes forfeiture of your interest in the Property or other material impairment of the lien created by this Mortgage or our security interest. We may also declare a default if you, during the loan application process, gave materially false or inaccurate information or statements to us (or failed to provide us with any material information) in connection with the loan evidenced by the Agreement, including, but not lmited to, representations concerning your occupancy of the Property as a principal or vacation residence. If this Mortgage is on a leasehold, you shall comply with the lease. If you acquire fee title to the Property, the leasehold and fee title shall not merge unless we agree to the merger in writing.

VL2392 PG049

6.    **Protection of Our Rights in the Property; Inspection.** If you fail to perform the covenants and agreements contained in this Mortgage, or there is a legal proceeding that may significantly affect our rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then we may do, and pay for, anything necessary or appropriate to protect the Property's value and our rights in the Property. Our actions may include paying any sums secured by a lien which has priority over this Mortgage or any advance under the Agreement or this Mortgage, appearing in court, paying reasonable attorney's fees, paying any sums which you are required to pay under this Mortgage and entering on the Property to make repairs. We do not have to take any action we are permitted to take under this paragraph. Any amounts we pay under this paragraph shall become additional debts you owe us and shall be secured by this Mortgage. These amounts shall bear interest from the disbursement date at the variable interest rate described in the Agreement and shall be payable, with interest, upon our request. We may enter and inspect the Property at any reasonable time and upon reasonable notice.

7.    **Condemnation.** The proceeds of any award for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to us. If the Property is abandoned, or if, after notice by us to you that the condemnor offers to make an award or settle a claim for damages, you fail to respond to us within 30 days after the date the notice is given, we are authorized to collect and apply the proceeds, at our option, either to restoration or repair of the Property or to the sums secured by this Mortgage, whether or not then due. Unless we and you otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments payable under the Agreement and Section 1 or change the amount of such payments.

8.    **You Are Not Released; Forbearance by Us Not a Waiver.** Extension of time for payment or modification of amortization of the sums secured by this Mortgage granted by us to any of your successors in interest shall not operate to release your liability or the liability of your successors in interest. We shall not be required to commence proceedings against any successor in interest, refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by you or your successors in interest. Our forbearance in exercising any right or remedy shall not waive or preclude the exercise of any right or remedy.

9.    **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Mortgage shall bind and benefit your successors and permitted assigns. Your covenants and agreements shall be joint and several. Anyone who signs this Mortgage but does not execute the Agreement: (a) is signing this Mortgage only to mortgage, grant and convey such person's interest in the Property; (b) is not personally obligated to pay the Agreement, but is obligated to pay all other sums secured by this Mortgage; and (c) agrees that we and anyone else who signs this Mortgage may agree to extend, modify, forbear or make any accommodations regarding the terms of this Mortgage or the Agreement without such person's consent.

10.    **Loan Charges.** If the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from you which exceed permitted limits will be refunded to you. We may make this refund by reducing the principal owed under the Agreement or by making a direct payment to you. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Agreement.

11.    **Notices.** Unless otherwise required by law, any notice to you provided for in this Mortgage shall be delivered or mailed by first class mail to the Property Address or any other address you designate by notice to us. Unless otherwise required by law, any notice to us shall be given by first class mail to our address stated above or any other address we designate by notice to you. Any notice provided for in this Mortgage shall be deemed to have been given to you or us when given as provided in this paragraph.

12.    **Governing Law; Severability.** The extension of credit secured by this Mortgage is governed by federal law, which for the purposes of 12 USC § 1463(g) incorporates Pennsylvania law. The interpretation and enforcement of this Mortgage shall be governed by the law of the jurisdiction in which the Property is located, except as preempted by federal law. In the event that any provision or clause of this Mortgage or the Agreement conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Agreement which can be given effect without the conflicting provision. To this end the provisions of this Mortgage and the Agreement are declared to be severable.

13.    **Transfer of the Property.** If all or any part of the Property or any interest in it is sold or transferred without our prior written consent, we may, at our option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by us if exercise is prohibited by federal law as of the date of this Mortgage.

BANK COPY

VL2392  PG050

**14.     Assignment.** We may sell, transfer or assign this Mortgage without your consent and without prior notice to you.

**15.     Hazardous Substances.** You shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. You shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of Hazardous Substances in quantities that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property. You shall promptly give us written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which you have actual knowledge. If you learn or are notified by any government or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, you shall promptly take all necessary remedial actions in accordance with Environmental Law. As used in this Mortgage, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this Mortgage, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

**16.     Acceleration; Remedies. We may declare a default if (1) any payment required by the Agreement or this Mortgage is not made when it is due; (2) we discover that you have committed fraud or made a material misrepresentation in connection with the Agreement; or (3) you take any action or fail to take any action that adversely affects our security for the Agreement, this Mortgage, or any right we have in the Property. If we declare a default (other than one arising under paragraph 13 hereof, unless applicable law provides otherwise), we will give you notice specifying: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to you, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage and foreclosure or sale of the Property. The notice shall further inform you of the right to reinstate after acceleration and the right to assert in the court the nonexistence of a default or any other defense you may have to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, we, at our option, may require immediate payment in full of all sums secured by this Mortgage without further demand and may invoke any of the remedies permitted by applicable law. We shall be entitled to collect all reasonable expenses incurred in pursuing the remedies provided in this Section 16, including, but not limited to, reasonable attorneys' fees as permitted by applicable law, and costs of title evidence.**

**17.     Discontinuance of Enforcement.** Notwithstanding our acceleration of the sums secured by this Mortgage under the provisions of Section 16, we may, in our sole discretion and upon such conditions as we in our sole discretion determine, discontinue any proceedings begun to enforce the terms of this Mortgage.

**18.     Release.** Upon your request that we terminate the Agreement secured by this Mortgage and the payment and discharge of all sums secured by this Mortgage, this Mortgage shall become null and void, and we shall release this Mortgage. You will pay any recordation costs.

**19.     Additional Charges.** You agree to pay reasonable charges as allowed by law in connection with the servicing of the Agreement and this Mortgage including, without limitation, the costs of obtaining tax searches and subordinations. Provided, however, that nothing contained in this section is intended to create and shall not be construed to create any duty or obligation by us to perform any such act, or to execute or consent to any such transaction or matter, except a release of this Mortgage upon full repayment of all sums secured hereby and termination of the Agreement.

**20.     Waivers.** You waive all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquish all rights of curtesy and dower in the Property. No waiver by us at any time of any term, provision or covenant contained in this Mortgage or in the Agreement secured hereby shall be deemed to be or construed as a waiver of any other term, provision or covenant or of the same term, provision or covenant at any other time.

**21.     Riders to this Mortgage.** If one or more riders are executed by you and recorded together with this Mortgage, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Mortgage as if the rider(s) were part of this Mortgage.

    ☐ Condominium Rider            ☐ 1-4 Family Rider

    ☐ Planned Unit Development Rider    ☐ Other(s) [specify]

BANK COPY

BY SIGNING BELOW, you accept and agree to the terms and covenants contained in this Mortgage and in any exhibit or rider(s) executed by you and recorded with it.

Signed, sealed and delivered in the presence of:

_Lucille Fazzina_

Lucille Fazzina

_Elizabeth Goulet_

Elizabeth Goulet

_Lillian J. Clark_ _____ (SEAL)

LILLIAN J CLARK

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

STATE OF Connecticut

COUNTY OF Hartford  ss: Enfield

The foregoing instrument was acknowledged before me this MARCH 21, 2008, by LILLIAN J CLARK (name(s) of person(s) acknowledged)

_Tracy B. Jeanis_

(Signature of person taking acknowledgment)

Tracy B. Jeanis

Name:

Notary Public/Commissioner of the Superior Court

My Commission Expires:



> Tracy B. Jeanis
> Notary Public - Connecticut
> My Commission Expires
> 3/31/2012

**Clerk: After recording, please return to: Sovereign Bank,** Mail Stop 10-421-CP2, 450 Penn Street, Reading, PA 19602

VL2392 PG052

**EXHIBIT A**
**TO CONNECTICUT**
**OPEN-END MORTGAGE**
(Securing Future Advances)

**EXCERPTS FROM HOME EQUITY LINE OF CREDIT AGREEMENT**

THIS EXHIBIT A is made on MARCH 21, 2008 and is incorporated into and shall be deemed to supplement the Mortgage of the same date given by the undersigned mortgagor(s) ("you" or "your") to Sovereign Bank, a federal savings bank ("Lender", "we", "us" or "our"), covering the Property described in the Security Instrument and located at 70 ELM ST , ENFIELD, CT 06082 (Property Address). The Mortgage secures a Home Equity Line of Credit Agreement dated the same date as the Mortgage ("Agreement"). The Agreement includes the following provisions (among others):

"DEFINITIONS: As used in this Agreement...: "Annual Percentage Rate" means the annualized cost of the advances charged to your Account as the result of applying a Periodic Rate to your daily Account balances each billing cycle, "Finance Charge" means the dollar amount the advances charged to your Account will cost you, "New Balance" means the sum of the advances charged to your Account and our charges at the end of the billing cycle, "Periodic Rate" means the cost of the advances charged to your Account as a daily rate, and "Statement" means the monthly statement of our charges for your use of the Account."

"ADVANCES & TERM: Unless extended by amendment, the length of the period of time during which you can obtain advances on your Account is 15 years and is referred to in this Agreement as the 'Draw Period'.... After the Draw Period ends, the repayment period will begin and you will no longer be able to obtain advances on your Account. The length of the repayment period is 15 years from the end of the Draw Period...."

"Rate Changes. We will determine the Periodic Rate and the corresponding Annual Percentage Rate monthly as follows: We start with an independent index which is the highest rate reflected as the latest U.S. Prime Rate published in the Money Rates table of The Wall Street Journal (the "Index"). We will use the most recent Index value available to us as of the first business day of the calendar month to make any Annual Percentage Rate adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Agreement, we may designate a substitute index after notice to you. To determine the daily Periodic Rate that will apply to your Account, we add - 1.01 % percentage points (which includes any applicable Preferred Rate Reduction described below) (the "Margin") to the value of the Index, and then divide the result by the number of days in a year. To obtain the Annual Percentage Rate that corresponds to the Periodic Rate, we multiply the daily Periodic Rate by the number of days in a year. This result is the Annual Percentage Rate that corresponds to the Periodic Rate. The Annual Percentage Rate includes only interest and no other costs...."

"The Periodic Rate and the corresponding Annual Percentage Rate may increase or decrease as often as once each month. The Periodic Rate and the corresponding Annual Percentage Rate will also increase upon the termination of any applicable Preferred Rate Reduction described below. The maximum **ANNUAL PERCENTAGE RATE** that can apply during the term of this Agreement is the lesser of 18% or the maximum rate allowed by applicable law. The **ANNUAL PERCENTAGE RATE** will never be less than 1.990%. Except for this 1.990% minimum and this 18% maximum (or, if less, the maximum rate allowed by applicable law), there is no limit on the amount by which the Annual Percentage Rate or the corresponding Periodic Rate can change during any one-year period..."

"Preferred Rate Reduction. If you have asked us to automatically deduct your Minimum Payment from your Sovereign checking, money market or statement savings account, your Margin, Periodic Rate and your Annual Percentage Rate shown above reflect a reduction in the Margin (the amount of this reduction is the Preferred Rate Reduction). If you authorize us to automatically deduct your minimum monthly payments from a Sovereign Premier, Business Owner Premier, Partnership, Team Member Private or Team Member Checking, or Premier Money Market Savings or other qualifying account, your margin (and Annual Percentage Rate) has been reduced by .50%. If you authorize us to automatically deduct your minimum monthly payments from any other Sovereign deposit account, your margin (and Annual Percentage Rate) has been reduced by .25%. If the automatic deduction service stops for any reason, your Margin, and thus your Annual Percentage Rate, will increase by 0.250 or 0.500 percentage points, as applicable, and your corresponding Periodic Rate will also increase. You may stop this automatic deduction service by telling us or by closing your checking, money market or statement savings account. We may stop this automatic deduction service if you do not maintain enough funds in your checking, money market or statement savings account to pay your Minimum Payment. "

"PAYMENT OPTIONS: Payment Option 1: ☐ If the box preceding this sentence is checked, for any billing cycle during the Draw Period, your Minimum Payment will be equal to the sum of (i) all accrued Finance Charge and other charges for the billing cycle (minimum $20), plus (ii) optional Loan Protection Plan(s) fees, if any, plus (iii) any other fees and charges and any amounts past due or in excess of your Credit Limit. For any billing cycle after the end of the Draw Period, your Minimum Payment will be equal to the sum of (i) 1/180th of the outstanding balance of principal at the end of the Draw Period, or $20, whichever is more, plus (ii) all accrued Finance Charges for the billing cycle, plus (iii) optional Loan Protection Plan(s) fees, if any, plus (iv) any other fees and charges and any amounts past due. You must also pay any Late Charges then outstanding. The amount of your Minimum Payments may increase if the Annual Percentage Rate increases....."

"Payment Option 2: ☒   If the box preceding this sentence is checked, for any billing cycle during the Draw Period, your Minimum Payment will be equal to the sum of (i) 1/240th of the average daily balance plus all accrued Finance Charge at the end of the billing cycle, or $20, whichever is more (or the entire balance if less than $20), plus (ii) optional Loan Protection Plan(s) fees, if any, plus (iii) any other fees and charges and any amounts past due or in excess of your Credit Limit. For any billing cycle after the end of the Draw Period, your Minimum Payment will be equal to the sum of (i) 1/180th of the outstanding balance of principal at the end of the Draw Period, or $20, whichever is more, plus (ii) all accrued Finance Charges for the billing cycle, plus (iii) optional Loan Protection Plan(s) fees, if any, plus (iv) any other fees and charges and any amounts past due. You must also pay any Late Charges then outstanding. The amount of your Minimum Payments may increase if the Annual Percentage Rate increases."

"Change to Payment Option: After you choose a Payment Option, you may ask us to change your Payment Option during the Draw Period as long as we consider your Account to have been in good standing at all times. Any changes in your Payment Option must be for a period of not less than 12 months."

"Fixed Rate Lock Conversion Option: After you open your Home Equity Line of Credit Account, you may ask us to change your variable interest rate to a fixed rate of interest on all or a portion of your principal balance ("Fixed Rate Lock"), as long as we consider your Account to have been in good standing at all times. This option will be available only during the Draw Period.... The minimum amount of your principal balance for which you may elect a Fixed Rate Lock is $5,000. The repayment term for any Fixed Rate Lock must be at least 12 months and may not exceed 180 months or the maturity date of your Home Equity Line of Credit Account, whichever is earlier.... You may not transfer a Fixed Rate Lock balance to a new Fixed Rate Lock balance for a period of 12 months following the establishment of the Fixed Rate Lock balance, and you may not transfer additional amounts to any Fixed Rate Lock once it has been established. The portion of your credit line that is not transferred to a Fixed Rate Lock is called your Revolving Account. The amount of each Fixed Rate Lock will reduce your available credit on your Revolving Account. As you repay the principal balance of each Fixed Rate Lock, your available credit on your Revolving Account will increase as a result. The fixed rate of interest applicable to a Fixed Rate Lock will be determined at the time of each Fixed Rate Lock request and will be based on our current market rate at that time for Fixed Rate Home Equity Loans, except that the rate applicable to a Fixed Rate Lock will never be greater than 18% **ANNUAL PERCENTAGE RATE** or less than 1.99% **ANNUAL PERCENTAGE RATE**.... Once the rate of each Fixed Rate Lock has been established, that rate will not change... The amount of each Fixed Rate Lock payment will be included in your minimum Payment Due on your monthly statement. Regardless of the Draw Period Payment Option you select on your Revolving Account, repayment of each Fixed Rate Lock will be based on substantially equal monthly payments for a term you choose (but not to exceed 180 months or the maturity date on the Account, whichever is earlier) in an amount sufficient to repay the principal balance of each Fixed Rate Lock, together with interest at the Annual Percentage Rate for each Fixed Rate Lock...."

BY SIGNING BELOW, you accept and agree to the terms and provisions contained in this Exhibit A.

_Lillian J Clark_ _____ (SEAL)
LILLIAN J CLARK

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

RECORDED IN
ENFIELD LAND RECORDS

2008 APR -7 PM 3: 02

SUZANNE F. OLECHNICKI
TOWN CLERK

BANK COPY

DOC#0806670



To:        Whom It May Concern
From:      Heather Birch
Subject:   Merger Related Name Changes

Sovereign Bank acquired Waypoint Bank in February 2005.
Harris Savings Association was renamed to Harris Savings Bank in July 1991.
Harris Savings Bank was renamed to Waypoint Bank in October 2000.
Waypoint Bank acquired York Federal Saving and Loan Association in October 2000.
York Federal Savings and Loan Association acquired Spartan Building and Loan Association in June 1989.
Waypoint Bank acquired First Federal Savings and Loan Association of Harrisburg in April 1996.
Waypoint Bank acquired Heritage Federal Savings and Loan Association in June 1991.
Waypoint Bank acquired Carlisle Building and Loan Association in January 1988.
Waypoint Bank acquired Manheim Savings and Loan Association in July 1984.
Waypoint Bank acquired Conestoga Savings and Loan Association in August 1982.
Conestoga Savings and Loan Association acquired Ephrata Building and Loan Association in January 1980.
Waypoint Bank acquired West Shore Savings and Loan Association in January 1982.
Sovereign Bank acquired Nantucket Bank in July 2004.
Sovereign Bank acquired Compass Bank for Savings in July 2004.
Compass Bank for Savings acquired Abington Savings Bank in April 2004.
Abington Savings Bank acquired Massachusetts Cooperative Bank in September 2002.
Abington Savings Bank acquired Hull Cooperative Bank in June 1994.
Abington Savings Bank acquired Landmark Bank for Savings in June 1992.
Compass Bank for Savings acquired Bay State Federal Savings Bank in June 2003.
Bay State Federal Savings Bank acquired Union Federal Savings Bank in February 1997.
Compass Bank for Savings acquired Sandwich Cooperative Bank in December 1998.
Sandwich Cooperative Bank acquired Plymouth Federal Savings Association in March 1994.
Sandwich Cooperative Bank acquired Wareham Cooperative Bank in May 1982.
Compass Bank for Savings acquired Martha's Vineyard National Bank in December 1994.
Compass Bank for Savings acquired Plymouth Federal Savings Association in March 1994.
Compass Bank for Savings acquired Fall River Savings Bank in April 1986.
Sovereign Bank acquired Independence Community Bank in September 2006.
Independence Community Bank acquired SI Bank & Trust in April 2004.
Independence Community Bank acquired Statewide Savings Bank in January 1996.
Independence Community Bank acquired Broad National Bank in July 1999.
Independence Community Bank acquired Bay Ridge Federal Savings Bank in January 1996.
Independence Community Bank acquired The Long Island City Savings and Loan Association in April 1992.
Independence Savings Bank was renamed to Independence Community Bank in September 1998.
South Brooklyn Savings Bank was renamed to Independence Savings Bank in June 1975.

Sept 2006

Heather Birch
Banking Officer
Sovereign Bank

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ANNAMARIE SPEICHER, Notary Public
City of Reading, Berks County
My Commission Expires October 11, 2012



To:        Whom It May Concern
From:      Heather Birch
Subject:   Merger Related Name Changes

Acquisitions and mergers listed chronologically:
National Westminster Bank acquired National Bank of North America in November 1983.
Fleet National Bank (a.k.a. Fleet Bank) acquired Merrill Bankshares, Bangor, ME (now Fleet Bank of Maine) in June 1986.
Fleet Financial Group and Norstar Bancorp merged creating Fleet / Norstar Financial Group in April 1988.
Shawmut Bank acquired assets of Framingham Trust Co. from FDIC IN June of 1988.
Fleet National Bank (a.k.a. Fleet Bank) acquired Indian Head Banks, Nashua, NH September 1988.
Fleet National Bank (a.k.a. Fleet Bank) acquired Connecticut Bank &Trust in January 1991.
Fleet / Norstar Financial Group (a.k.a. Fleet Bank) acquire Bell Financial Services in June 1991.
National Westminster Bank acquired First Jersey National Bank in December 1991.
National Westminster Bank acquired Port Funding, Inc. of Port Jefferson, NY in November 1992.
Fleet Bank acquired Bank of New England in 1993.
Connecticut National Bank changed its name to Shawmut Bank in January 1993.
Fleet Bank acquired Heritage Bank in January 1993.
National Westminster Bank acquired Central Jersey Bank & Trust in September 1994.
Shawmut Bank acquired New Dartmouth Bank (successor to First Federal Bank and New Hampshire Savings Bank South) in January 1995.
Fleet Bank acquired Shawmut Bank in December 1995.
Fleet Bank acquired National Westminster Bank in May 1996.
Bank Boston, N.A. (formerly known as First National Bank of Boston) acquired Bay Bank in May 1997.
Sovereign Bank acquired the Fleet Bank Automotive Financial Division on September 1997.
Sovereign Bank acquired Main Line Federal Savings in September 1998.
Fleet Bank acquired Bank Boston, N.A. in January 1999.
Sovereign Bank acquired First Home Savings Bank in April 1999.
Sovereign Bank acquired Trenton Savings Bank in June 1999.
Sovereign Bank acquired the former Bank Boston, N.A. Automotive Lending Division from Fleet Bank in May 2000.
Sovereign Bank acquired First Essex Bank in February 2004.
The terms "Fleet Bank", "Fleet Services", "Fleet Services Corp", "Fleet Financial Group", "Fleet". "Fleet, N.A.", "Fleet National Bank", "Fleet Bank, National Association", "Fleet Bank, N.A.", " Shawmut Bank", "Shawmut Bank, N.A.", "Shawmut National Bank", 'Shawmut National Bank of _____ County", "CNB", "Nat West", et al , have been used collectively and individually to represent the larger corporation and are covered by the aforementioned mergers and acquisition broad definitions.

_____
Heather Birch
Banking Officer
Sovereign Bank

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ANNAMARIE SPEICHER, Notary Public
City of Reading, Berks County
My Commission Expires October 11, 2012

SOVEREIGN BANK

- **INDEPENDENCE COMMUNITY BANK**
- STATEN ISLAND SAVINGS BANK
- SIB MORTGAGE CORP.
- SIB MORTGAGE CORP. D/B/A IVY MORTGAGE
- HOWELL STATE BANK
- SOUTH BROOKLYN SAVINGS BANK
- INDEPENDENCE SAVINGS BANK
- WESTERLIEGH FEDERAL SAVINGS AND LOAN ASSOCIATION
- STATE SAVINGS, FSB
- FEDERAL SAVINGS AND LOAN ASSOCIATION OF NEWBURGH, NY
- LONG ISLAND CITY SAVINGS AND LOAN ASSOCIATION
- BAY RIDGE FEDERAL SAVINGS BANK
- INDEPENDENCE COMMUNITY BANK CORP.
- BAY RIDGE BANCORP, INC.
- THE LONG ISLAND CITY FINANCE CORP.
- BROAD NATIONAL BANK
- STATEWIDE SAVINGS BANK, SLA
- ARCH FEDERAL SAVINGS AND LOAN ASSOCIATION
- GARWOOD SAVINGS AND LOAN ASSOCIATION
- DELAWARE VALLEY SAVINGS AND LOAN ASSOCIATION
- SI BANK & TRUST
- FIRST STATE BANK
- GATEWAY STATE BANK
- NASSAU SAVINGS AND LOAN ASSOCIATION
- SERIAL FEDERAL SAVINGS AND LOAN ASSOCIATION OF NEW YORK CITY
- RICHMOND COUNTY FEDERAL SAVINGS AND LOAN ASSOCIATION
- **WAYPOINT BANK**
- HARRIS BUILDING AND LOAN
- MECHANICS BUILDING AND LOAN OF LEBANON
- HARRIS SAVINGS BANK
- HARRIS SAVINGS ASSOCIATION
- YORK FEDERAL SAVINGS AND LOAN ASSOCIATION
- SPARTAN BUILDING AND LOAN ASSOCIATION
- FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF HARRISBURG
- AVSTAR MORTGAGE CORP.
- FIRSTAR MORTGAGE CORP.
- HERITAGE FEDERAL SAVINGS ASSOCIATION
- CARLISLE BUILDING AND LOAN ASSOCIATION
- MANHEIM SAVINGS AND LOAN ASSOCIATION
- CONESTOGA SAVINGS AND LOAN ASSOCIATION



- EPHRATA BUILDING AND LOAN ASSOCIATION
- WEST SHORE SAVINGS AND LOAN ASSOCIATION
- **COMPASS BANK FOR SAVINGS**
- BAY STATE FEDERAL SAVINGS BANK
- UNION FEDERAL SAVINGS BANK
- BROOKLINE FEDERAL SAVINGS AND LOAN ASSOCIATION
- SANDWICH CO-OPERATIVE BANK
- PLYMOUTH FEDERAL SAVINGS ASSOCIATION
- WAREHAM CO-OPERATIVE BANK
- MARTHA'S VINEYARD NATIONAL BANK
- NEW BEDFORD FIVE CENTS SAVINGS BANK
- NANTUCKET BANK
- OLD COLONY MORTGAGE CORP.
- **ABINGTON SAVINGS BANK**
- MASSACHUSETTS CO-OPERATIVE BANK
- HULL CO-OPERATIVE BANK
- **FIRST ESSEX BANK**
- PELHAM BANK AND TRUST CO.
- FIRST ESSEX SAVINGS BANK OF NEW HAMPSHIRE
- BROADWAY SAVINGS BANK
- ESSEX BROADWAY SAVINGS BANK
- FIRST ESSEX BANCORP OF NH
- FORTUNE GUARANTY SAVINGS BANK
- FIRST ESSEX BANK, FSB
- **MAIN STREET BANK**
- BERKS COUNTY BANK
- HERITAGE NATIONAL BANK
- SCHUYLKILL HAVEN TRUST
- MINERS NATIONAL BANK OF SHENANDOAH
- FIRST NATIONAL BANK OF TAMAQUA

- **TRENTON SAVINGS BANK, FSB**
- BURLINGTON COUNTY BANK
- CARTERET FEDERAL SAVINGS BANK
- ADMIRAL-BUILDERS SAVINGS & LOAN ASSOC.
- FIRST FEDERAL SAVINGS & LOAN ASSOC. OF
  MONTGOMERY COUNTY
- MOUNTAIN SECURITY SAVINGS BANK
- MIDTOWN SAVINGS & LOAN ASSOC.
- FIRST FEDERAL SAVINGS & LOAN ASSOC.
- BARTON SAVINGS & LOAN ASSOC.
- RIVER EDGE SAVINGS & LOAN ASSOC.
- MAHWAH SAVINGS & LOAN ASSOC.
- LAWRENCE BROOK SAVINGS & LOAN ASSOC.
- CAPITAL-ST. GEORGE SAVINGS & LOAN ASSOC.
- STACY SAVINGS & LOAN ASSOC.

- CO-OPERATIVE SAVINGS & LOAN ASSOC. OF BERGEN COUNTY
- BURLINGTON SAVINGS BANK
- CARNEGIE BANK, NA
- **FIRST HOME SAVINGS BANK, FSB**
- WHITE EAGLE FEDERAL SAVINGS BANK
- FIDELITY MUTUAL SAVINGS & LOAN ASSOC.
- SURETY BUILDING & LOAN ASSOC.
- YORKSHIP SQUARE SAVINGS & LOAN ASSOC.
- **MAIN LINE BANK**
- MAIN LINE FEDERAL SAVINGS BANK
- PHILADELPHIA MORTGAGE CORP.
- COMMONWEALTH STATE BANK
- SUBURBAN FEDERAL SAVINGS BANK
- MEDIA FEDERAL SAVINGS & LOAN ASSOC.

- WYOMISSING SUBURBAN BUILDING AND LOAN ASSOCIATION
- WYOMISSING BUILDING AND LOAN ASSOCIATION
- WYOMISSING BUILDING AND SAVINGS ASSOCIATION
- WYOMISSING FEDERAL SAVINGS AND LOAN ASSOCIATION
- PROVIDENT FEDERAL SAVINGS AND LOAN ASSOCIATION
- WYOMISSING PROVIDENT FEDERAL SAVINGS AND LOAN ASSOCIATION
- NEW HOME SAVINGS AND LOAN ASSOCIATION
- KUTZTOWN BUILDING AND LOAN ASSOCIATION
- UNION BUILDING AND LOAN ASSOCIATION
- INDUSTIAL BUILDING AND LOAN ASSOCIATION OF LANCASTER
- HOME BUILDING AND LOAN ASSOCIATION OF LANCASTER
- NEW HOME SAVINGS AND LOAN ASSOCIATION
- FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF LANCASTER
- NEW HOLLAND BUILDING AND LOAN ASSOCIATION
- MY. JOY BUILDING AND LOAN ASSOCIATION
- WYOMISSING NEW HOME FEDERAL BUILDING AND LOAN ASSOCIATION
- MANATAWNY BUILDING AND LOAN ASSOCIATION
- FIRST FEDERAL SAVINGS AND LOAN OF ALLENTOWN
- NEW HOME FEDERAL SAVINGS AND LOAN ASSOCIATION
- PENN SAVINGS BANK, FSB
- BANKERS SAVINGS
- THE PERTH AMBOY SAVINGS INSTITUTION
- BOONTON MOUNTAIN SAVINGS AND LOAN ASSOCIATION
- OCEAN INDEPENDENT BANK
- FIRST STATE SAVINGS AND LOAN ASSOCIATION



- FIRST DEWITT BANK
- FIRST DEWITT SAVINGS BANK
- FIRST DEWITT SAVINGS AND LOAN ASSOCIATION
- DEWITT SAVINGS AND LOAN ASSOCIATION
- CHARTER FEDERAL SAVINGS BANK
- CHARTER FEDERAL SAVINGS AND LOAN ASSOCIATION
- CEDAR GROVE SAVINGS AND LOAN ASSOCIATION
- WEST JERSEY COMMUNITY BANK
- COLONIAL STATE BANK
- MUTUAL AID SAVINGS AND LOAN ASSOCIATION
- HARMONIA SAVINGS BANK
- JERSEY SHORE SAVINGS AND LOAN ASSOCIATION
- KEYSTONE SAVINGS AND LOAN ASSOCIATION
- SEASIDE SAVINGS AND LOAN ASSOCIATION
- SHIP BOTTOM SAVINGS AND LOAN ASSOCIATION
- UNITED SAVINGS AND LOAN ASSOCIATION
- NASSUA SAVINGS AND LOAN ASSOCIATION
- YARDLEY SAVINGS AND LOAN ASSOCIATION





**Office of Thrift Supervision**
Department of the Treasury

1700 G Street, N.W., Washington, D.C. 20552 • (202) 906-6000

## CERTIFICATE OF MERGER

**REFERENCE:** Independence Community Bank
Brooklyn, New York

I, Roslyn E. Weeks, Corporate Secretary, Office of Thrift Supervision, hereby certify, according to the records of the Office of Thrift Supervision, Department of the Treasury, Washington, DC:

1.   Independence Community Bank, Brooklyn, New York, was incorporated under the laws of the State of New York to transact the business of a State Savings Bank;

2.  Effective September 8, 2006, Independence Community Bank, Brooklyn, New York, merged with and into Sovereign Bank, Wyomissing, Pennsylvania, and Sovereign Bank, Wyomissing. Pennsylvania was the surviving institution and ;

3.  Sovereign Bank, Wyomissing, Pennsylvania, is a federally chartered savings bank , and its charter is in full force and effect.

DATED this 14th day of September 2006.

*Roslyn E. Weeks*
**Roslyn E. Weeks**
**Corporate Secretary**

The foregoing instrument was subscribed and sworn to before me by Roslyn E. Weeks, Corporate Secretary, Office of Thrift Supervision, this 14th day of September, 2006.

*Jean B. Gray*
**Jean B. Gray**
**Notary Public, District of Columbia**
**My Commission Expires: 4/14/2010**

Each depositor insured to at least $250,000 per insured bank

BankFind Home   Return to BankFind Results        Questions & Suggestions

# Sovereign Bank, National Association(FDIC #: 29950)
Status: Active • Insured Since March 10, 1938
Sovereign Bank, National Associationis an active bank
Data as of: May 1, 2013

| Overview | Locations | History | Identifications |

## History of Sovereign Bank, National Association (FDIC #: 29950) in Wyomissing, PA

**Show Acquisitions**

| Date | Event |
|------|-------|
| 1/1/1907 | Institution established: Original name:New Home Federal Savings and Loan Association (29950) |
| 7/31/1976 | Acquired New Home Savings and Loan Association (31021) in READING, PA |
| 8/31/1981 | Acquired First Federal Savings and Loan Association (30274) in ALLENTOWN, PA |
| 1/31/1984 | Acquired First Federal Savings and Loan Association (30240) in LANCASTER, PA |
| 2/29/1984 | Changed organization type to MUTUAL SAVINGS BANK |
| 2/29/1984 | Changed name to **Penn Savings Bank FSB** (29950) |
| 12/31/1986 | Changed organization type to STOCK SAVINGS BANK |
| 8/23/1991 | Acquired Nassau Federal Savings and Loan Association (32982) in PRINCETON, NJ |
| 9/6/1991 | Acquired United Savings and Loan Association of Trenton, F.A. (33083) in TRENTON, NJ |
| 12/31/1991 | Changed name to **Sovereign Bank, A Federal Savings Bank** (29950) |
| 12/31/1991 | Acquired Yardley Bank for Savings, FSB (28320) in YARDLEY, PA |
| 9/11/1992 | Acquired Jersey Shore Savings and Loan Association (30236) in TOMS RIVER, NJ |
| 1/16/1993 | Acquired Harmonia Savings Bank (16610) in ELIZABETH, NJ |
| 8/27/1993 | Acquired Home Unity Federal Savings and Loan Association (33605) in LAFAYETTE HILL, PA as part of a government assisted transaction. |
| 11/6/1993 | Acquired Valley Federal Savings and Loan Association (27687) in EASTON, PA |
| 8/5/1994 | Acquired Shadow Lawn Savings Bank, SLA (30042) in LONG BRANCH, NJ |
| 10/31/1994 | Acquired Charter Federal Savings Bank (30653) in RANDOLPH TOWNSHIP, NJ |
| 5/31/1996 | Acquired West Jersey Community Bank (32913) in FAIRFIELD, NJ |
| 12/23/1996 | Changed name to **Sovereign Bank** (29950) |
| 2/19/1997 | Acquired First Dewitt Bank (30198) in WEST CALDWELL, NJ |
| 3/31/1997 | Acquired Sovereign Community Bank (27323) in FREEHOLD, NJ |
| 8/30/1997 | Acquired Bankers Savings (12029) in PERTH AMBOY, NJ |

| Date | Event |
| --- | --- |
| 3/1/1998 | Acquired Main Line Bank (29628) in VILLANOVA, PA |
| 7/31/1998 | Acquired First Home Savings Bank, F.S.B. (31771) in PENNSVILLE, NJ |
| 7/31/1998 | Acquired Carnegie Bank, National Association (27194) in LANGHORNE, PA |
| 6/30/1999 | Change trust powers from TRUST POWERS NOT GRANTED to FULL TRUST POWERS GRANTED |
| 6/30/1999 | Acquired Trenton Savings Bank FSB (12009) in LAWRENCEVILLE, NJ |
| 3/8/2002 | Acquired Main Street Bank (27104) in READING, PA |
| 5/3/2002 | Acquired Sovereign Trust Company (33208) in MANCHESTER TOWNSHIP, NJ |
| 2/6/2004 | Acquired First Essex Bank (90219) in LAWRENCE, MA |
| 7/23/2004 | Acquired Nantucket Bank (22055) in NANTUCKET, MA |
| 7/23/2004 | Acquired Compass Bank for Savings (23291) in NEW BEDFORD, MA |
| 2/11/2005 | Acquired Waypoint Bank (30174) in HARRISBURG, PA |
| 9/9/2006 | Acquired Independence Community Bank (16018) in BROOKLYN, NY |
| 6/20/2011 | Moved bank headquarters from WYOMISSING, PA to WILMINGTON, DE |
| 7/21/2011 | Changed primary regulatory agency from OFFICE OF THRIFT SUPERVISION to COMPTROLLER OF THE CURRENCY |
| 1/26/2012 | Changed organization type to COMMERCIAL BANK |
| 1/26/2012 | Changed name to **Sovereign Bank, National Association** (29950) |
| 1/26/2012 | Changed institution class to INSURED COMMERCIAL BANK, NATIONAL, MEMBER FRS |



9/8/06

InstitutionHistory



FFIEC home | Federal Reserve
Board home

Accessibility | Disclaimer |
Privacy Policy

| NIC Home | Institution Search | USBA Search | Top 50 HCs |
|---|---|---|---|
| BHCPR Peer Reports | FAQ | | |

**Institution History for** SANTANDER BANK, NATIONAL ASSOCIATION (722777)

10 institution history record(s) found.            < Previous  Page 1 ·      Next >

| Event Date | Historical Event |
|---|---|
| 1902-01-01 | WYOMISSING NEW HOME FEDERAL SAVINGS & LOAN ASSOCIATION located at 840 PENN AVENUE, WYOMISSING, PA was established as a Savings & Loan Association. |
| 1980-11-03 | WYOMISSING NEW HOME FEDERAL SAVINGS & LOAN ASSOCIATION was renamed to NEW HOME FEDERAL SAVINGS & LOAN ASSOCIATION. |
| 1984-01-01 | NEW HOME FEDERAL SAVINGS & LOAN ASSOCIATION was renamed to PENN SAVINGS BANK, FSB and changed from Savings & Loan Association to Federal Savings Bank. |
| 1986-12-01 | PENN SAVINGS BANK, FSB moved to 840 PENN AVE WYOMISSING, PA. |
| 1988-01-02 | PENN SAVINGS BANK, FSB moved to 1130 BERKSHIRE BLVD WYOMISSING, PA. |
| 1991-12-31 | PENN SAVINGS BANK, FSB was renamed to SOVEREIGN BANK,FSB. |
| 1996-12-23 | SOVEREIGN BANK,FSB was renamed to SOVEREIGN BANK. |
| 2011-06-20 | SOVEREIGN BANK moved to 824 NORTH MARKET STREET, SUITE 100 WILMINGTON, DE. |
| 2012-01-26 | SOVEREIGN BANK was renamed to SOVEREIGN BANK, NATIONAL ASSOCIATION and changed from Federal Savings Bank to National Bank. |
| 2013-10-17 | SOVEREIGN BANK, NATIONAL ASSOCIATION was renamed to SANTANDER BANK, NATIONAL ASSOCIATION. |

· Page 1 of 1

NIC Home  |  FAQ  |  Help  |  Contact Us